**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 24 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

LARRY SOUZA,

      Defendant - Appellant.

No. 99-4147

Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:97-CR-0276-S)

Charles Bevan Corry, Salt Lake City, Utah, for Defendant-Appellant.

Leshia M. Lee-Dixon, Assistant United States Attorney, Salt Lake City, Utah, for
Plaintiff-Appellee.

Before **EBEL, PORFILIO, and MAGILL,**[*] Circuit Judges.

**MAGILL,** Circuit Judge.

    This appeal raises issues concerning the inevitable discovery doctrine in the

Tenth Circuit. On May 3, 1999, Larry Souza pled guilty to an indictment

---

[*]Honorable Frank Magill, Senior Circuit Judge, United States Court of Appeals for
the Eighth Circuit, sitting by designation.

charging him with one count of possession with intent to distribute

methamphetamine and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1)

and 18 U.S.C. § 2. Souza appeals the district court's[1] denial of his motion to

suppress drug evidence discovered as the result of a search, conducted at a United

Parcel Service (UPS) facility in Sacramento, California, of a package addressed to

him. For reasons to be discussed, we affirm the judgment of the district court.

## I. BACKGROUND

This case arises out of the following events. On June 9, 1997, agents of the

Drug Enforcement Administration (DEA) were training officers assigned to a

Sacramento task force on drug parcel interdiction. The training took place at the

UPS office in West Sacramento. Detective Steve Sloan was one of the officers

conducting the training at the UPS facility.[2] At approximately 5:30 p.m., a white

cardboard box caught Detective Sloan's attention as he watched packages pass by

---

[1]The Honorable David Sam, United States District Judge for the District of Utah.

[2]Detective Sloan is employed by the city of San Diego Police Department as a detective assigned to the DEA narcotics task force. Detective Sloan has worked as a narcotics detective for over 12 years and has had extensive experience in airport and parcel interdiction. Detective Sloan testified that for the last 18 months prior to his testimony in this case, he has worked with a parcel interdiction squad. He has also taught the California Narcotics Officers Association, the DEA Jetway Program, and state and local agencies in California. In his classes, he teaches methods in recognizing smuggling characteristics in packages and interdicting such packages where they have either controlled substances or narcotics-related currency.

on a conveyer belt. Detective Sloan believed that the package might contain contraband because it had been sent through third party shipping, the sender had only used a first name, all openings on the box were heavily taped with a clear tape, and the box was solid so that no side of it could be compressed. Detective Sloan testified that he suspected the box was filled with a type of foam that expands and hardens once it is put in the box, a characteristic that he believed, based on his experience as a narcotics detective, indicated that the box contained contraband.

The package was taken off the conveyer belt and placed next to a wall behind Detective Sloan. Special Agent Donald Rowden,[3] also part of the interdiction operations, noticed the same suspicious characteristics of the package and decided to conduct a test to see if a narcotics dog would alert to the package. Special Agent Rowden took the package to a parking lot off UPS property and set the package on the ground with four other controlled packages that were placed about three feet apart and placed a plastic milk crate over each package. Special Agent Rowden then directed a narcotics dog, Clause,[4] to sniff the packages.

_____

[3]Special Agent Rowden is employed as a special agent for the California Department of Justice, Bureau of Narcotic Enforcement in the Sacramento Regional Office. He has been employed with that office for approximately nine years and is currently assigned to the Sacramento Transportation Interdiction Narcotic Group as a canine detection trainer.

[4]Clause has been through the NAYCOR Canine Training Center where he was
(continued...)

Clause positively alerted to the package that had been targeted by Rowden and Sloan for the presence of narcotics.  Due to the way Clause alerted to the package, Special Agent Rowden was certain the package contained narcotics. Special Agent Rowden returned the package to Detective Sloan and advised him that he wanted to hold the package to write an application for a search warrant based on the probable cause of the narcotics dog alert.[5]  Special Agent Rowden called his office and told an assistant to pull up a statement of probable cause and to stay at the office because they were going to return with a package and "write a warrant" on it.

Detective Sloan took the package and placed it behind him on the floor next to the wall.  Subsequently, a UPS employee, April Denning, arrived on the scene. According to Denning's testimony, a conversation was initiated by Detective Sloan who told her that a narcotics dog had alerted to the package and "stated that they couldn't tell me to open the package, they were not authorized to do that, they would have to have a search warrant, but he pointed to where the package was."  A couple of minutes later, another officer again told Denning, "I

---

[4](...continued)
certified by the California Narcotic Canine Association as being 100% proficient in the detection of marijuana, cocaine, methamphetamine, opium, and heroin.

[5]Special Agent Rowden did not keep the package himself because he was testing other packages with Clause and did not want to contaminate any of the packages.

-4-

cannot tell you to not open the package, but there it is on the floor." Denning estimated that approximately five minutes passed between the two conversations. She also testified that she was influenced by the statements of the interdiction officers.

After his conversation with Denning, Detective Sloan continued evaluating other packages that were on the conveyer belt. Approximately a minute or two after Detective Sloan continued with his evaluation, Denning picked the targeted package up, took it a few feet away to where her work station was located, and began opening the package. Detective Sloan watched Denning open the package but did not tell her not to open it because he felt it was "not his right to stop her." He also believed that she was acting within UPS policy in opening the package.[6]

Due to hardened foam that completely encased everything, Denning had difficulty opening the package. She started tearing some of the foam away and, at that point, DEA agents intervened using a knife to cut through the foam and located the Tupperware container that was inside the package. The Tupperware container revealed a brownish substance that appeared to be methamphetamine. When Detective Sloan saw the methamphetamine, he took custody of the package. Detective Sloan then turned the package over to Special Agent Rowden, who was

_____

[6]In fact, Denning testified that as part of her employment with UPS, she could open a package any time she felt that it was appropriate. She also stated that she opened randomly selected packages almost daily.

upset because he wanted to "get a couple of warrants behind Clause for reliability purposes" and because he knew "it would have been a good warrant." Special Agent Rowden took custody of the package, observed what appeared to be methamphetamine, and issued a property receipt to UPS for the package. Special Agent Rowden then conducted a closer inspection of the package at his office, which revealed that the Tupperware container held plastic bags containing approximately 197 grams of a substance which tested positively for methamphetamine.

The address on the package indicated that it was being sent to Souza in Myton, Utah. The package was sent to Sergeant Hendricks of the Duchesne County Sheriff's Office for a controlled delivery to the address in Myton. After receiving the package, Sergeant Hendricks submitted it to a narcotics dog and the dog alerted to the presence of drugs in the package. Sergeant Hendricks obtained a search warrant for the Souza residence from a state district court judge in Duchesne County prior to the controlled delivery of the package to the Souza residence. The package was then delivered to the Souza residence and Souza was subsequently arrested.

Souza filed a motion to suppress the evidence on October 17, 1997. After a hearing, Magistrate Judge Samuel Alba issued a Report and Recommendation on May 22, 1998, recommending that Souza's motion to suppress evidence and

statements be granted. On July 15, 1998, the district court entered an order granting in part and denying in part Magistrate Judge Alba's Report and Recommendation. The district court agreed that the search was in violation of the Fourth Amendment but concluded that the evidence should not be suppressed because "but for the unlawful conduct, which was independent of the investigative means . . . , the evidence inevitably would have been discovered by independent lawful means, specifically, a properly obtained search warrant."

## II. ANALYSIS

Souza urges us to affirm the district court's holding that the government impermissibly influenced and participated in the search of the package by Denning, but to conclude that the district court erred by applying the inevitable discovery exception and denying the motion to suppress. The government argues that Souza's Fourth Amendment rights were not violated by the search because when Denning opened the package, she did so pursuant to her training in company policy, which allowed her to conduct searches of packages mailed through UPS, and not as an agent of the government or with the participation or knowledge of any governmental official. The government also argues that even if the search violated Souza's Fourth Amendment rights, the evidence found in the box would have inevitably been discovered through a valid search warrant. Although we

review the ultimate Fourth Amendment question de novo, the district court's factual determinations are reviewed only for clear error. See United States v. Humphrey, 208 F.3d 1190, 1203 (10th Cir. 2000).

## A. Legality of the Denning Search

The Fourth Amendment protects citizens against unreasonable searches and seizures by government actors. See Burdeau v. McDowell, 256 U.S. 465, 475 (1921). However, the Fourth Amendment does not apply to searches by private parties absent governmental involvement in the search. See Humphrey, 208 F.3d at 1203. A search by a private person becomes a government search "if the government coerces, dominates, or directs the actions of a private person" conducting the search. Pleasant v. Lovell, 876 F.2d 787, 796 (10th Cir. 1989). In such cases, "the private citizen may be regarded as an agent or instrumentality of the police and the fruits of the search may be suppressed." United States v. Smythe, 84 F.3d 1240, 1242 (10th Cir. 1996).

In determining whether a search by a private person becomes a government search, the following two-part inquiry is utilized: "1) whether the government knew of and acquiesced in the intrusive conduct, and 2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends." Pleasant, 876 F.2d at 797 (citations and quotations omitted). Both prongs must be satisfied before the private search may be deemed a government

search.  See United States v. Leffall, 82 F.3d 343, 347 (10th Cir. 1996).  The totality of the circumstances guides the court's determination as to whether the two-part inquiry has been met.  See Smythe, 84 F.3d at 1243.

If a government agent is involved "merely as a witness," the requisite government action is absent and the search will be deemed private.  See id.  The police must "instigate, orchestrate, encourage or exceed the scope of the private search to trigger application of the Fourth Amendment."  Id.  The police are under no duty to discourage private citizens from conducting searches of their own volition.  See id.  In Smythe, McCartney, the manager of a bus station in Sheridan, Wyoming, received a suspicious package from two men who requested that the package be shipped via bus to California.  See id. at 1241.  After the men left the station, McCartney, for safety reasons, became concerned about the contents of the box and, among other things, called the Sheridan Police Department (SPD) in an effort to determine whether he could open the package.  See id.  Sergeant Walker of the SPD arrived shortly thereafter and informed McCartney that he believed that McCartney could open the package but that he could not.  See id.  Sergeant Walker "never touched the package, did not assist, ask or otherwise encourage Mr. McCartney to open the package and stepped away as Mr. McCartney opened the package."  Id.  McCartney testified that the decision to open the package was entirely his, and that he would have opened the package

regardless of the police presence. <u>See</u> <u>id.</u> The Tenth Circuit held that the search was not a governmental search because McCartney had a legitimate, independent motivation to open the package based on his independently formed belief that something was dangerous about the package and his concern for the passengers on the bus in which the package was to be shipped. <u>See</u> <u>id.</u> at 1243. <u>See also</u> <u>Leffall</u>, 82 F.3d at 349 (finding that a police officer acting as a witness while an airline employee opened a package was not sufficient to make the airline employee a government agent where the airline employee acted to pursue his employer's interests in deterring traffic in illegal substances and contraband and the police did nothing to encourage the employee to conduct the search).

In this case, in contrast to <u>Smythe</u> and <u>Leffall</u>, the officers had substantially more involvement in the search of the box than merely being witnesses to the search. First, the officers specifically targeted the box and placed it to the side for safekeeping. Second, the officers twice, within a span of five minutes, attempted to encourage Denning to open the package and Denning testified that she was influenced by the officers' attempts. While companies such as UPS have legitimate reasons to search packages independent of any motivation to assist police, <u>see</u>, <u>e.g.</u>, <u>United States v. Parker</u>, 32 F.3d 395, 399 (8th Cir. 1994), there is no evidence that in this instance Denning had a legitimate, independent

motivation to open the package, despite her practice of randomly opening packages on other occasions.

Perhaps most damning of all is that, as the district court found, the officers substantially assisted in the search initiated by Denning. A "'search is a search by a federal official if he had a hand in it' and . . . '[s]o long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it.'" United States v. Knoll, 16 F.3d 1313, 1320 (2d Cir. 1994) (quoting Lustig v. United States, 338 U.S. 74, 78-79 (1949) (plurality opinion)). When Denning experienced difficulty opening the package, she testified that the DEA agents took over the task, taking the package from her and using a knife to cut through the foam where they found the Tupperware container which held the contraband. Denning did not cut through the packaging material, nor was she the one who discovered the Tupperware container and its contents. While private searches generally do not raise constitutional concerns, the Fourth Amendment would be seriously undermined if the search of the package in this case was described as anything other than orchestrated by the government.

## B. Inevitable Discovery Exception

Although a search may violate the Fourth Amendment, the exclusionary rule is inapplicable if the evidence inevitably would have been discovered by lawful means. See Nix v. Williams, 467 U.S. 431, 444 (1984). The "inevitable

discovery exception applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct." United States v. Larsen, 127 F.3d 984, 986 (10th Cir. 1997). The government has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation. See United States v. Eylicio-Montoya, 70 F.3d 1158, 1165 (10th Cir. 1995).

While the Tenth Circuit has applied the inevitable discovery exception on several occasions, those cases involving violations of the Fourth Amendment turned on whether legal doctrines providing exceptions to the warrant requirement would have inevitably led to discovery of the evidence.[7] Compare United States v. Haro-Salcedo, 107 F.3d 769, 773-74 (10th Cir. 1997) (finding that evidence inevitably would have been discovered by inventory search mandated by city police department); Eylicio-Montoya, 70 F.3d at 1166-67 (finding that inevitable discovery exception applied because while defendant had been prematurely arrested, the police had probable cause to stop the vehicle and in the process of

---

[7]Larsen is one case that involved a violation of the Fourth Amendment where the case did not turn on an exception to the warrant requirement. However, Larsen does not shed much light on the issues to be decided in this case because the court in Larsen focused solely on whether the inevitable discovery rule requires proof of a separate investigation ongoing at the time of the constitutional violation. See Larsen, 127 F.3d at 986-87.

-12-

doing so lawfully noticed suspicious burlap bags during the course of the lawful stop); United States v. Horn, 970 F.2d 728, 732 (10th Cir. 1992) (holding that inevitable discovery exception applicable because evidence would have been inevitably discovered in a subsequent inventory search); and United States v. Romero, 692 F.2d 699 (10th Cir. 1982) (holding that inevitable discovery exception applied because contraband would have been lawfully discovered while conducting search of defendant after arrest), with United States v. Owens, 782 F.2d 146, 152-53 (10th Cir. 1986) (refusing to apply the inevitable discovery exception because the government's claim that the contraband in question would have been inevitably discovered by the motel's cleaning staff was too speculative).

In this case, there is no exception to the warrant requirement that could serve as a basis for the inevitable discovery exception. The police had probable cause to open the package and intended to obtain a search warrant to do so, but prematurely caused the package to be opened in violation of the Fourth Amendment. While the inevitable discovery exception does not apply in situations where the government's only argument is that it had probable cause for the search,[8] the doctrine may apply where, in addition to the existence of probable

---

[8]In United States v. Mejia, 69 F.3d 309 (9th Cir. 1995), the court said:

(continued...)

cause, the police had taken steps in an attempt to obtain a search warrant. In

United States v. Allen, 159 F.3d 832 (4th Cir. 1998), the Fourth Circuit said the

inevitable discovery exception may apply where

> the subsequent search that inevitably would have uncovered the disputed evidence required a warrant and the police had probable cause to obtain this warrant prior to the unlawful search but failed to do so, *if* the government produces evidence that the police would have obtained the necessary warrant absent the illegal search. Such evidence might include proof that, based on independent evidence available at the time of the illegal search, the police . . . took steps to obtain a warrant prior to the unlawful search.

Id. at 841 (emphasis in original).

"[W]hat makes a discovery 'inevitable' is not probable cause alone . . . but

probable cause plus a chain of events that would have led to a warrant (or another

justification) independent of the search." United States v. Brown, 64 F.3d 1083,

1085 (7th Cir. 1995). The key issue in these cases, one of probability, is how

likely it is that a warrant would have been issued and that the evidence would

_____

[8](...continued)
We reject the contention that this doctrine applies where the police had probable cause to conduct a search but simply failed to obtain a warrant. . . .This court has never applied the inevitable discovery exception so as to excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant. . . .[T]o excuse the failure to obtain a warrant merely because the officers had probable cause and could have obtained a warrant would completely obviate the warrant requirement.

Id. at 319-20 (citations and quotations omitted).

have been found pursuant to the warrant. In <u>United States v. Cabassa</u>, 62 F.3d 470 (2d Cir. 1995), the court found the following factors helpful in this determination: 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search," <u>id.</u> at 473; 2) the strength of the showing of probable cause at the time the search occurred, <u>see id.</u> at 473-74; 3) whether a warrant ultimately was obtained, albeit after the illegal entry, <u>see id.</u> at 473; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli," <u>id.</u> at 473 n.2.

The extent to which the warrant process has been completed at the time those seeking the warrant learn of the search, and whether a warrant is ultimately obtained, are factors entitled to great importance in determining whether the evidence would have inevitably been discovered pursuant to a warrant. As the court in <u>Cabassa</u> explained

> First, the extent of completion relates directly to the question of whether a warrant would in fact have issued; ultimate discovery would obviously be more likely if a warrant is actually obtained. Second it informs the determination of whether the same evidence would have been discovered pursuant to the warrant. If the process of obtaining a search warrant has barely begun, for example, the inevitability of discovery is lessened by the probability, under all the circumstances of the case, that the evidence in question would no longer have been at the location of the illegal search when the warrant actually issued.

<u>Id.</u> at 473.

-15-

In those cases where, although police had announced an intent to secure a warrant, courts have declined to apply the inevitable discovery exception, the reason was that, after weighing the probability of obtaining a warrant and the probability that the evidence would have been discovered pursuant to the warrant, the contingencies involved were too uncertain to justify application of the doctrine. For example, in Cabassa, police officers entered an apartment before a search warrant had been issued, even though the process for securing a warrant had already been started, because of the officers' fear that their position near the apartment would be discovered and the evidence disappear. See id. at 474. The Second Circuit refused to apply the inevitable discovery exception because the government's showing of probable cause was not overwhelming, thus raising questions whether a magistrate judge would have issued a warrant, and because of the uncertainty whether, if the police had waited for a search warrant, the evidence would have been in the apartment when a lawful search occurred. See id. at 474. See also Mejia, 69 F.3d at 319 (noting that, in addition to the fact that the police took no steps to secure a warrant, "it is unclear whether there was competent evidence that would have supported an application for a warrant"); Allen, 159 F.3d at 842-43 (declining to apply the inevitable discovery exception because the police did not have probable cause at the time of the illegal search

and no evidence indicated that the officers ever contemplated obtaining a search warrant).

In contrast, courts have applied the inevitable discovery exception when, after an analysis of the relevant contingencies, they have been reasonably certain that the evidence would have been discovered pursuant to a search warrant. In United States v. Lamas, 930 F.2d 1099 (5th Cir. 1991), the police decided to secure the house of a drug dealer, Lamas, to prevent the destruction or removal of evidence they believed was inside the house. See id. at 1100. The officers conducted a valid cursory protective search for weapons and other persons and, while inside, Officer Garcia attempted to convince Lamas to consent to a full search. See id. at 1100-01. At some point while Officer Garcia was talking with Lamas, but before Lamas consented to the search, Officer DuBois left to prepare an affidavit to obtain a search warrant for the house. See id. at 1101. As Officer DuBois was walking to his car, another officer stopped him and informed him that Lamas had consented, involuntarily it turned out, to a search of the house. See id. Officer DuBois then abandoned his plans to secure a search warrant and returned to the house. See id. The Fifth Circuit found that the existence of probable cause to search the house, the officers' securing the house until a warrant could be obtained, and one of the officers leaving the house to get a search warrant before the invalid consent was obtained was sufficient to support application of the

-17-

inevitable discovery exception.  See id. at 1103.  See also United States v. Ford, 22 F.3d 374, 378 (1st Cir. 1994) (applying inevitable discovery exception after finding that both probable cause to search and that the seized evidence would have been discovered following the authorized search was undisputed); United States v. Buchanan, 910 F.2d 1571, 1574 (7th Cir. 1990) (applying inevitable discovery exception after finding that probable cause to search a room for a gun existed and that narcotics would have inevitably been found in the search); United States v. Whitehorn, 829 F.2d 1225, 1231 (2d Cir. 1987) (applying inevitable discovery exception after finding that the police had "overwhelming probable cause" to search a house in which evidence reasonably could be expected to be found and that they were proceeding to secure a search warrant when the illegal search occurred).

As discussed above, a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means.  Inevitable discovery analysis thus requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred.  In warrantless search questions, the process requires analysis of the factors described

by the court in Cabassa. The more contingencies there are, and the lower the probability that each would have been resolved in the government's favor, the lower the probability that the evidence would have been found by lawful means.

In this case, the probability is very high that the evidence would have been discovered pursuant to a search warrant. First, the prerequisite to a consideration of the inevitable discovery exception in these cases, steps taken to obtain a warrant prior to the unlawful search, is present in this case. Special Agent Rowden took steps to alert his office that he would be coming back to prepare a warrant for the package and made sure that the affidavit form would be ready when he got back to his office. Also, the package was specifically placed on the floor behind Detective Sloan for the purpose of obtaining a warrant. Second, at the time the illegal search occurred, probable cause to believe the package contained contraband was extremely strong. The package itself contained several suspicious characteristics, including all of the openings on the box being heavily taped, the box having been sent through third party shipping, the sender having only used a first name, and the box being solid so that no side of it could be compressed. Moreover, the box was alerted to by a certified narcotics dog, which is itself sufficient to create probable cause. See United States v. Blaze, 143 F.3d 585, 592 (10th Cir. 1998) (stating that "[o]nce a dog alerts to a container, probable cause exists to open and search it"). Moreover, a search warrant

eventually was obtained by Sergeant Hendricks. Third, unlike the situation in Cabassa, there is no question in this case concerning the inevitability of discovery of the evidence if the police had obtained a search warrant because the package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued.

We conclude that but for Denning opening the package, Special Agent Rowden would have obtained a warrant and the evidence would have been discovered. In most cases, the failure of the police to secure a warrant will probably be fatal. However, if a proper consideration of the relevant factors convinces a court that the challenged evidence would inevitably have been discovered by independent lawful means, exclusion of the evidence "would put the police in a worse position than they would have been in absent any error or violation." Nix v. Williams, 467 U.S. 431, 443 (1984). Although we are very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convinces us that this is one of those occasions when the doctrine should apply.

### III. CONCLUSION

In sum, we affirm the judgment of the district court concluding that although the search of the package violated the Fourth Amendment, the inevitable discovery exception should apply in this case and bar exclusion of the evidence.