**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 19 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee,

　　v.

IRA L. MOORE,

　　　　Defendant - Appellant.

No. 01-1156

(D.C. No. 98-CR-193-M)

(D. Colorado)

---

**ORDER AND JUDGMENT** *

---

Before **LUCERO** and **ANDERSON** , Circuit Judges, and **BROWN** ,** District Judge.

---

　　Following a jury trial, defendant Ira Moore was found guilty of one count

of robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951(a); one count of using

and carrying firearms in connection with the robbery, in violation of 18 U.S.C.

§ 924(c); unlawful possession of a machine gun, in violation of 18 U.S.C.

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

**The Honorable Wesley E. Brown, United States District Judge for the
District of Kansas, sitting by designation.

§ 922(o)(1); and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). The district court sentenced Moore to a total of 138 months imprisonment, followed by five years of supervised release. We affirm.

## BACKGROUND

Chad Lawrence was a firearms dealer and owner of Cal's Sporting Armory in Englewood, Colorado. Cal's Sporting Armory was authorized to sell restricted firearms such as machine guns, silencers and sawed-off shotguns.

At approximately 7:30 p.m. on April 22, 1998, Lawrence was pricing inventory behind one of the store's glass display cases when Kevin Shuler, accompanied by another individual, entered the store. [1] Both men wore dark pants, gray pinstripe shirts, and baseball caps. Shuler was taller than his companion. The shorter of the two individuals asked Lawrence where a particular item was and Lawrence left the counter to show him. After talking to the man for a few minutes, Lawrence turned to walk back to the counter. The shorter man grabbed him from behind and pinned his arms to his side while Shuler held a gun to his head.

---

[1] Shuler and Moore were codefendants. Shuler ultimately plead guilty to the robbery. We affirmed his conviction. United States v. Shuler, 181 F.3d 1188, 1191 (10th Cir. 1999).

The shorter robber then took Lawrence's keys and went to a back room. Shuler continued to restrain Lawrence and asked him where the bulletproof vests and MP5s were. [2] Lawrence was taken into a back room, forced to lie down on the floor, and taped with duct tape on his hands, feet and eyes. He heard the two men opening cabinets and walking in and out of the store. When the store sounded empty, Lawrence freed his hands, triggered the alarm system and grabbed a shotgun. When he saw Shuler returning to the store, Lawrence fired the shotgun at him. Shuler and his companion fled the store, taking with them several firearms, including an MP5, and Lawrence's keys and wallet. [3]

Early the following morning, the Arapahoe County Sheriff's Department developed computer-generated sketches of the two robbers, based upon Lawrence's descriptions of them. Later that day, an attorney contacted the Sheriff's Department, stating that he had a client who wished to remain anonymous who had information about the Cal's Sporting Armory robbery. Investigator Paul Goodman interviewed the informant by phone. The informant provided a detailed account of the robbery and identified Shuler as one of the

[2]MP5s are German-made machine guns which Lawrence had in his store for demonstration purposes and to sell to law enforcement.

[3]The firearms stolen, besides the MP5, were three Bushmaster semi-automatic assault rifles, two .45 caliber handguns, one of which was equipped with a silencer, and one .9 millimeter handgun. Tr. of Hr'g on Motions at 17, R. Vol. 7.

robbers. He described Shuler as a 6'1" African-American man with several tattoos on his chest. The informant told Goodman that, during the robbery, Shuler had knocked over the store video camera and simultaneously dropped his own gun (a .9 millimeter Norinco handgun), that the owner had been duct-taped, that the robbers made several trips in and out of the store, and that the owner had fired at Shuler. The informant also provided details about where Shuler worked and lived, the kind of car he drove, and the whereabouts and identities of his girlfriends. Police were able to corroborate much of the informant's information about the robbery and Shuler. [4] The informant also provided some information on the second robber–that he was a shorter, stockier, African-American male known as "Ira," "Iroc," or "Roc."

Law enforcement officers presented Lawrence with a six-man photographic array early in the morning of April 24. He identified Shuler as the taller of the two robbers. Later that day, police arrested Shuler soon after he arrived at his construction job. The police interviewed Shuler's girlfriend, Orchid Field, when she arrived at his place of work for lunch. Field testified that on the night of the robbery, she had picked Shuler up at the intersection of First and Havana, near the

---

[4]For example, the store video camera had in fact been knocked over, and a loaded .9 millimeter Norinco handgun found in the store was not in Lawrence's inventory. Further, the informant accurately identified Shuler's residence, his girlfriends, his place of work, and the fact that he had tattoos on his body.

Timber Leaf Apartments.  Tr. of Hr'g on Motions at 112, R. Vol. 7.  One of the officers involved testified that Field said that "he [Shuler] was carrying a duffel bag that clinked when he placed it in the car."  Id. at 30.  Field later denied making such a statement, testifying that she only mentioned the bag because she felt compelled to do so by the police.  Id. at 121-22.

Field further stated that she had taken or met Shuler there on other occasions, and was under the impression that Shuler's friend, Ira, lived in the Timber Leaf Apartments.  Field indicated she did not know Ira's last name, but knew he was referred to as "Roc."

Field and, apparently at times, Shuler lived with Field's mother, Janet Field.  Janet Field consented to a search of their apartment, which turned up the three stolen Bushmaster semi-automatic rifles, two handguns, some ammunition, Lawrence's wallet and keys, and a pair of pants, shirt and cap matching the description of the clothes worn by the robbers.

On the afternoon of April 24, Arapahoe County Sheriff's Investigator Jeffrey Britegam went to the Timber Leaf Apartment Leasing Office to look for a short, stocky African-American in his early 30's named "Ira" and with a possible last name of "Griffin."  The apartment management staff told Britegam that the only "Ira" living at the apartment complex was the defendant, Ira Moore.  They gave him Moore's apartment number, date of birth and phone number, and

showed him a photocopy of Moore's driver's license. Britegam communicated this information to his command center.

As Britegam was walking near Moore's apartment, the door suddenly opened and Moore and another man walked outside carrying several cardboard boxes. When back-up officers arrived at the apartment complex, officers at the command station arranged for Orchid Field to make a controlled telephone call to Moore.[5] During this monitored call, Field told Moore that the police had arrested Shuler and that she did not know what to do with "the guns." Tr. of taped conversation at 1, Attachment 1 to Mot. to Exclude Evid. of Tape Recorded Conversation, R. Vol. 2, Doc. 191. Moore responded, "[i]f you can, get 'em out." Id. Moore asked Field where she was and whether he could call her back. Moore also stated, "I told him," and "I hope he knows to do the right thing." Id. at 2. The officers outside Moore's apartment arrested Moore when he stepped outside his apartment while talking on the telephone to Field. A search of his apartment uncovered clothes similar to those worn by the robbers. Moore was then taken to the Arapahoe County Sheriff's Office, booked by Deputy Sheriff Douglas Cover, and photographed as part of the booking process.

---

[5]The district court subsequently suppressed the contents of this telephone call, concluding that Field had not made the call voluntarily.

On April 27, Lawrence was shown a six-man photo array containing the booking photograph of Moore. Lawrence identified Moore as the second robber. In a November 1, 2000, post-indictment lineup, containing Moore and five other men, Lawrence again identified Moore as the second robber. [6] At this line-up, each participant was asked to step forward and repeat three times a question the shorter robber had asked Lawrence during the robbery. At trial, Lawrence again identified Moore as the second robber.

Moore filed a motion to suppress his post-arrest statements, evidence seized at his apartment, and the booking photograph taken at the police station. After an evidentiary hearing, the district court granted the motion with respect to his statements and the evidence seized from his apartment. The district court concluded that, while there was probable cause to arrest Moore, the officers at the apartment who actually arrested Moore were not "privy to" the information establishing probable cause. Tr. of Trial Preparation Conference Proceedings at 5-7, R. Vol. 10. The court rejected the government's argument that the "collective knowledge" of the officers at the station and the arresting officers provided probable cause for the officers at the apartment complex to arrest Moore, because there had been no "actual communication" of the information

---

[6]There was a two-year delay between Moore's indictment and his trial.

establishing probable cause from the officers at the station to the officers at the complex. Id. at 5.

However, the court denied the part of the motion seeking suppression of the booking photograph, concluding that, because there was probable cause to arrest Moore (even though the arresting officers were not aware of that probable cause), "ultimately he would have been arrested . . . [and] upon arrest, the defendant would have been photographed and, therefore, the photograph used in the photo I.D. identification procedure is not covered by the exclusionary rule because it would have inevitably been obtained under any circumstance of this case." Id. at 6-7.

The jury convicted Moore. The primary issue at trial was whether Moore was, in fact, the shorter robber. Lawrence identified Moore at trial and testified concerning his identification of Moore from the photographic array, which included the booking photograph.

Moore appeals, arguing the district court erred "in holding that the police would have inevitably arrested Mr. Moore, where the objective indications are that the police did not believe they had probable cause, the showing of probable cause was not overwhelming, and the government offered no testimony that the police would have arrested Mr. Moore had the officers at the scene not illegally arrested him." Appellant's Opening Br. at 2. He thus argues the court erred in

declining to suppress his booking photograph and the identifications allegedly based thereon.

**DISCUSSION**

"In assessing a challenge to a district court's denial of a motion to suppress evidence, this court reviews *de novo* the question of reasonableness under the Fourth Amendment." United States v. King, 222 F.3d 1280, 1283 (10th Cir. 2000). Further, "[w]e view the evidence produced at the pretrial suppression hearing in the light most favorable to the government and accept the district court's factual findings unless they are clearly erroneous." United States v. Yazzie, 188 F.3d 1178, 1193 (10th Cir. 1999).

The district court denied suppression of Moore's booking photograph in reliance on the "inevitable discovery" doctrine. Under this doctrine, even if Moore's initial arrest was unlawful, "the exclusionary rule is inapplicable if the evidence inevitably would have been discovered by lawful means." United States v. Souza, 223 F.3d 1197, 1202 (10th Cir. 2000). "The government has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation." Id. at 1203. In examining whether the government has met its burden of proof, we look at "demonstrated historical facts," not at "speculative elements." Nix v.

Williams , 467 U.S. 431, 444 n.5 (1984). Thus, in this case, we may affirm the district court's refusal to suppress the booking photograph if we conclude that the government proved by a preponderance of the evidence that it would have obtained the booking photograph even without Moore's illegal arrest.

We begin by noting that the district court specifically found that, at the time of Moore's arrest, the officers at *police headquarters* had sufficient information establishing probable cause to arrest Moore. Moore does not dispute this finding on appeal. [7]

We have said that "'what makes a discovery "inevitable" is not probable cause alone . . . but probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the search.'" Souza , 223 F.3d at 1204 (quoting United States v. Brown , 64 F.3d 1083, 1085 (7th Cir. 1995)). "The key issue in these cases, one of probability, is how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant." Id.

In Souza, we approved the following factors as "helpful" in assessing inevitability:

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search" . . . ; 2) the

---

[7]Moore conceded at oral argument that, while he pursued this issue in the district court, he does not press it on appeal.

> strength of the showing of probable cause at the time the search occurred . . . ; 3) whether a warrant ultimately was obtained, albeit after the illegal entry . . . ; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli[.]"

Id. (quoting United States v. Cabassa, 62 F.3d 470, 473-74 & n.2 (2d Cir. 1995)). Moore argues that the following combination of circumstances compel the conclusion that the police would not have inevitably arrested, booked and photographed Moore without the prior illegal arrest: (1) the fact that the police had not even begun the process of obtaining an arrest or search warrant, (2) the fact that a warrant was never in fact obtained, and (3) the fact that, in his view, the police only had a modest degree of probable cause for his arrest. We disagree.

The objective historical facts facing the police at the time of Moore's arrest were as follows: an anonymous informant had provided accurate and corroborated information about Shuler's involvement with the robbery; this same informant had told police that Shuler's accomplice was a shorter, stockier African-American known as "Ira" or "Roc;" on the night of the robbery, Orchid Field had picked up Shuler from a location very near Moore's apartment complex, to which Field had taken Shuler and from which she had picked him up on prior occasions and where she believed his friend Ira or "Roc" lived; Moore was the only "Ira" living at that apartment complex; and Moore appeared generally, from

-11-

the photocopy of his driver's license on file with the apartment manager, to match the description of Shuler's accomplice. Further, the police were in the process of obtaining information from the recorded phone conversation between Field and Moore which strongly suggested Moore's familiarity with Shuler and with the stolen guns found in Field's apartment. Additionally, police had sent several back-up officers to Moore's apartment complex, and they knew they were dealing with a suspect in an armed robbery of a firearms store in which a number of very dangerous weapons had been stolen. Thus, the police had ample probable cause to believe that Moore was involved in a serious robbery. [8]

Furthermore, while Souza and some of our other cases discussing the inevitable discovery doctrine emphasize the importance of the police taking steps toward obtaining a warrant, and that probable cause alone will not excuse the absence of a warrant otherwise required, in those cases an actual warrant was a prerequisite to a lawful search. For example, in Souza, the police developed probable cause to search a package at a United Parcel Service facility. As we observed, "[t]he police had probable cause to open the package and intended to

---

[8]We only consider the suppressed phone conversation for the purposes of determining whether the police would inevitably have arrested Moore. Because Moore does not contest the legal question of whether the police at headquarters had probable cause, we therefore do not consider the conversation for the purposes of determining the legal question of whether there was probable cause to arrest Moore.

-12-

obtain a search warrant to do so, but prematurely caused the package to be opened in violation of the Fourth Amendment." Souza, 223 F.3d at 1203. In that case, obtaining a warrant was the only way the police could have legally opened the package: "there is no exception to the warrant requirement that could serve as a basis for the inevitable discovery exception [in this case]." Id. In such a situation, we have held that the police may not simply ignore the warrant requirement and conduct an illegal search, but must, instead, demonstrate that "'the police would have obtained the necessary warrant absent the illegal search.'" Id. (quoting United States v. Allen, 159 F.3d 832, 841 (4th Cir. 1998)). They could make such a demonstration with "'proof that, based on independent evidence available at the time of the illegal search, the police . . . took steps to obtain a warrant prior to the unlawful search.'" Id. (quoting Allen, 159 F.3d at 841.)

In Souza, we in fact upheld application of the inevitable discovery exception, although we noted we rarely do so in the circumstances of that case:

> Although we are very reluctant to apply the inevitable discovery
> exception in situations where the government fails to obtain a search
> warrant and no exception to the warrant requirement exists, in this
> case the inevitability of discovery of the evidence convinces us that
> this is one of those occasions when the doctrine should apply.

Souza, 223 F.3d at 1206. A factor heavily influencing our decision was that the police had taken steps to obtain a warrant, although they had not yet obtained one at the time of the premature, illegal search.

We further observed in Souza that we more typically and readily apply the inevitable discovery exception in situations where some "exception[] to the warrant requirement would have inevitably led to discovery of the evidence." Id. at 1203 (citing United States v. Haro-Salcedo, 107 F.3d 769, 773-74 (10th Cir. 1997); United States v. Elycio-Montoya, 70 F.3d 1158, 1165 (10th Cir. 1995); United States v. Horn, 970 F.2d 728, 732 (10th Cir. 1992); United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)). Such is the case here.

In this case, as Moore acknowledges, the police could have made a warrantless arrest of Moore outside his apartment complex once they had probable cause to believe he was involved in the robbery. That is precisely what they did. Indeed, all the evidence in this cases suggests that, although there was confusion about whether the order to arrest Moore had officially been transmitted to the officers on the scene at Moore's apartment, the police were poised and ready to give that order once Moore got off the phone with Field. Thus, while Moore invites us to speculate that, for some reason, the police did not feel they had adequate probable cause to make a warrantless arrest, and would, therefore, not have arrested Moore the moment he stepped outside his apartment door, the

-14-

record in this case indicates the exact opposite—that the police at headquarters had probable cause to arrest Moore, that they knew he was in the apartment and had recently been seen going in and out of it, that they had directed officers at the scene to, in effect, conduct a de facto stakeout of Moore's apartment, and that they were going to arrest him as soon as he emerged from his apartment.

Accordingly, we affirm the district court's conclusion that the police, possessing probable cause to arrest Moore, would inevitably have ordered the police staking out his apartment to arrest him once he emerged therefrom. Once arrested, he would most certainly have been taken to police headquarters, booked and photographed. Thus, the police would have inevitably obtained a booking photograph of Moore.

**CONCLUSION**

For the foregoing reasons, we AFFIRM Moore's conviction.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge

-15-