**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 1, 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 04-3026

WILLIAM CUNNINGHAM,

Defendant-Appellant.

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 03-CR-20073-GTV)**

---

Patrick J. Berrigan, of Watson & Dameron, LLP, Kansas City, Missouri, appearing for the Defendant-Appellant.

Leon J. Patton, Assistant U.S. Attorney (Eric F. Melgren, United States Attorney, with him on the briefs), Kansas City, Kansas, appearing for the Plaintiff-Appellee.

---

Before **SEYMOUR**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **KELLY**, Circuit Judge.

---

**SEYMOUR**, Circuit Judge.

Mr. William Cunningham conditionally pled guilty to one count of making, possessing, and uttering counterfeit securities (checks), in violation of 18 U.S.C. §§ 2 and 513(a). He appeals the denial of his motion to suppress, contending the district court erred in finding that his consent to a search of his home by law enforcement officers was voluntary. We affirm on the alternative basis of the inevitable discovery doctrine.

**I**

From November 2002 through January 2003, law enforcement officers were investigating a counterfeit check-writing ring in the Kansas City metropolitan area. On January 28, 2003, four suspects in the ring were arrested as they tried to pass counterfeit checks at banks in Overland Park, Kansas and Kansas City, Missouri. Information obtained from these suspects led law enforcement to believe they should focus their investigation on the 1100 block of East 76th Terrace in Kansas City, Missouri. Specifically, one of the suspects identified the residence at 1179 East 76th Terrace as the house from which their check "supplier," James Hughes, had gone to obtain the counterfeit checks. Another suspect reported that Hughes had actually acquired the checks from the neighboring house at 1175 East 76th Terrace. The two remaining suspects were unsure whether Hughes had derived the checks from either address. Police noted

that the homes share a common driveway.

Based on this information, Police Detective Kevin Duncan prepared an affidavit for a search warrant for the residence located at 1175 East 76th Terrace and presented it to the Assistant United States Attorney (AUSA). According to Detective Duncan, during the meeting with the AUSA,

> We came to the agreement that at this time it wouldn't be best to proceed with the search warrant based on the possibility that we would go into the wrong address. Obviously, that was a concern to everyone, and we decided to go ahead and continue surveillance and now concentrate on that area including those two houses . . . .

Aplt. App. at 82-83. In other words, although probable cause existed to believe that the supplier had obtained the checks from either 1175 or 1179 East 76th Terrace, the police pursued a policy of additional surveillance in order to specifically determine which of the two houses was the source of the criminal activity. The officers set up surveillance of the residences on the evening of January 29, 2003. That night they observed a red Chevrolet Lumina parked at 1179 East 76 Terrace. The vehicle matched the description of a car belonging to Tikko Parish, an individual previously identified by other suspects as someone who had frequently accompanied Hughes. As the car left the residence, officers stopped it and discovered both Hughes and Parish inside.

Police also stopped a black pickup truck in the area, which was being driven by Mr. Cunningham. He informed them he resided at 1179 East 76th

Terrace. Mr. Cunningham was arrested on unrelated charges of driving with a suspended driver's license and transported to jail. Although Mr. Cunningham had not been implicated in the check-writing ring, the black pickup truck he drove matched the description of one identified earlier in the investigation.

Subsequent to the traffic stops, officers decided to knock at the door of 1175 East 76th Terrace. The residents, a family of three, permitted the officers to enter and look around their home. They spoke freely with the police and pointed out that the gray Blazer parked in the shared driveway – which matched the description of a vehicle earlier identified with Hughes – belonged to 1179 East 76th Terrace. Once the officers were satisfied that Hughes had not obtained the checks from 1175 East 76th Terrace, they decided to attempt to make contact with someone at 1179 East 76th Terrace.

As police knocked at the door of 1179 East 76th Terrace, Detective Linny Cunningham, a twenty-five year veteran of the Kansas City, Missouri, Police Department, arrived on the scene. Mrs. Cunningham recognized one of the officers present as Sergeant Roy Orth, a fellow member of her police department. Although Sergeant Orth was superior in rank to Mrs. Cunningham, he had no supervisory authority over her. Mrs. Cunningham identified herself as the owner of the house and reported that although she did not live at the location, her twenty-nine year old son, William Cunningham, had resided there for five years.

Sergeant Orth indicated that the officers needed to get inside the house. He declined Mrs. Cunningham's offer to let them in, however, due to her inability to legally consent to a search of the home.

In the meantime, police released Mr. Cunningham from jail on a bond and transported him to 1179 East 76th Terrace for the purpose of obtaining his consent to search the house. When Mr. Cunningham arrived, the officers implored him to give consent to a search of his residence. They indicated that they were conducting an ongoing investigation and would obtain a search warrant should he refuse to provide consent. Nevertheless, Mr. Cunningham repeatedly refused to give permission to search. Even after his mother spoke to him, he continued to resist signing the consent form. Eventually, Mrs. Cunningham told her son "I got the feeling that I was in trouble now with the PD because with Orth there and he's expecting me to get [the consent form] signed for him." *Id*. at 192. She also informed her son that should he decide not to sign the consent form, the police were going to get a warrant and "they were going to go in there and they are going to tear up your house. Hopefully they won't do anything to the dogs inside of the house." *Id*. at 203. As Mrs. Cunningham spoke to her son, "he was sad, and he started sobbing." *Id*. at 192.

According to Mr. Cunningham's testimony, his mother said:

[T]hey are going to get in your house; they are going to tear your doors down. Your dogs are in there. You've got a pit bull, you know . . . . They

-5-

are going to destroy your house. They are going to tear your doors off the hinges. Your dogs are going to get shot. Just let them in.

*Id*. at 217-18. Mr. Cunningham testified he was concerned that he had already embarrassed his mother and did not wish to get her into trouble. He spoke with her for five to ten minutes and "it was just upsetting." *Id*. at 219. At the conclusion of their conversation and approximately twenty minutes after his arrival on the scene, Mr. Cunningham finally consented to the search of his home.

During the search, the police observed numerous items of evidentiary value including check stock paper, a shredder, and a computer with latex gloves nearby. The officers did not seize any evidence at the time. Instead, they secured the premises and revised their prior affidavit for a search warrant to include the new information that had focused them on 1179 East 76th Terrace, as well as the evidence they had seen at Mr. Cunningham's residence. A magistrate judge signed a search warrant and the police then seized the incriminating items.

Mr. Cunningham filed a motion to suppress the evidence obtained from his home, arguing that his mother had coerced his consent. The district court, however, found that the consent was valid and voluntary, stating:

> I find that this may have been a very awkward situation for Mrs. Cunningham, the defendant's mother, but I think whether she was a mother or an officer or how she was acting is not really the point here because I think the totality of the evidence – and even if the representations that she made, if she made them to the defendant as a police officer, would still in this court's opinion fall short of coercion such as to render the consent other than voluntary. That finding, of course, is tempered by the fact that

-6-

this was his mother telling him to sign this, and as I've said, even though it is an awkward situation for her, I find nevertheless that her actions did not rise to coercion.

*Id*. at 233. The court found that the officers had eliminated 1175 East 76th Terrace as a possibility before they obtained the warrant for Mr. Cunningham's home and there was thus probable cause for the warrant. Consequently, the court denied the motion to suppress.

## II

On appeal, Mr. Cunningham contends the totality of the circumstances amounted to duress and coercion that rendered his consent to search his home involuntary. He points to the following facts to bolster this contention. He initially and repeatedly refused to consent to the search while supervising officers at the scene implored his mother, a police detective, to convince him to change his mind. His dogs and personal property in the house were threatened with destruction should he not cooperate. He also was convinced his mother's employment would be jeopardized if he refused to consent. We need not decide whether Mr. Cunningham's consent was voluntary, however, because we conclude the inevitable discovery doctrine clearly applies here and supports the denial of Mr. Cunningham's motion to suppress.

While we review the district court's factual determinations for clear error,

our review of an ultimate Fourth Amendment question is *de novo*. *United States v. Souza*, 223 F.3d 1197, 1201 (10th Cir. 2000). When a search violates the Fourth Amendment, the exclusionary rule normally dictates that evidence obtained as a result of that search be suppressed. *See Nix v. Williams*, 467 U.S. 431, 442-43 (1984). The inevitable discovery doctrine provides an exception to the exclusionary rule, *see id.* at 444, 448; *United States v. Romero*, 692 F.2d 699, 704 (10th Cir. 1982), and permits evidence to be admitted "if an independent, lawful police investigation inevitably would have discovered it." *United States v. Owens*, 782 F.2d 146, 152 (10th Cir. 1986). The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation. *Souza*, 223 F.3d at 1203 (citation omitted).

In *Souza*, we set forth the standard for considering whether the inevitable discovery doctrine applies to a warrantless search. *Id.* at 1205. We addressed whether evidence found from the warrantless search of a package in a United Parcel Service (UPS) facility was admissible under the doctrine. *See id.* at 1199, 1201. Probable cause existed for the presence of narcotics in the package, including a positive alert by a narcotics dog. *Id.* at 1200. After a law enforcement officer had contacted his office and expressed his intent to procure a search warrant for the package, but before the warrant was obtained, a UPS

employee opened the package, assisted in part by an officer. *Id.* Reviewing

Tenth Circuit case law regarding inevitable discovery, we noted that our

precedents had involved application of the doctrine in conjunction with another

exception to the warrant requirement, such as an inventory search or a search

incident to arrest. *Id.* at 1203. The facts in *Souza*, however, did not fit within any

of the other warrant requirement exceptions. *Id.* Nonetheless, we held it

permissible for a court to apply the inevitable discovery doctrine

> when it has a high level of confidence that the warrant in fact would
> have been issued and that the specific evidence in question would
> have been obtained by lawful means. Inevitable discovery analysis
> thus requires the court to examine each of the contingencies involved
> that would have had to have been resolved favorably to the
> government in order for the evidence to have been discovered legally
> and to assess the probability of the contingencies having occurred.

*Id.* at 1205. To assist this determination, we adopted the factors set forth by the

Second Circuit to assess warrantless search situations:

> 1) the extent to which the warrant process has been completed at the
> time those seeking the warrant learn of the search; 2) the strength of
> the showing of probable cause at the time the search occurred; 3)
> whether a warrant ultimately was obtained, albeit after the illegal
> entry; and 4) evidence that law enforcement agents "jumped the gun"
> because they lacked confidence in their showing of probable cause
> and wanted to force the issue by creating a fait accompli.

*Id.* at 1204 (citing *United States v. Cabassa*, 62 F.3d 470, 473-74 & n.2 (2d Cir.

1995)) (internal quotations and citations omitted).[1]

We concluded in *Souza* that the steps taken by law enforcement officers satisfied the approach laid out in *Cabassa*. *Id.* at 1205. These included a law enforcement officer alerting his office that he would be coming back to prepare a warrant for the package, and ensuring an affidavit form would be ready when he arrived back at the station. Moreover, the package was specifically placed apart from others for the purpose of obtaining a warrant. *Id.* We also noted that extremely strong probable cause existed to believe contraband was in the package at the time of the illegal search, officers ultimately did obtain a search warrant, and there were no doubts regarding whether the officers would actually obtain the narcotics because the package had been secured by them. *Id.* at 1205-06. As a result, we determined that "but for [the UPS employee] opening the package, [law enforcement officers] would have obtained a warrant and the evidence would

---

[1]The requirement set forth in *United States v. Souza*, 223 F.3d 1197, 1204-05 (10th Cir. 2000), that the police have taken steps to obtain a warrant *prior* to the illegal search may arguably be read to conflict with our earlier case, *United States v. Larsen*, 127 F.3d 984 (10th Cir. 1997). In *Larsen*, we held that the inevitable discovery doctrine does *not* require there to be a separate investigation *ongoing* at the time of the constitutional violation. *Id.* at 986. We are not persuaded there is an actual conflict, however. *Larsen* addressed a scenario involving two unrelated and separate investigations. The circumstances in *Souza* and the current case involve one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal.

have been discovered." *Id.* We observed that "exclusion of the evidence 'would put the police in a worse position than they would have been in absent any error or violation.'" *Id.* (quoting *Nix*, 467 U.S. at 443).

The present case squares with *Souza*. Here, the officers took substantial steps to obtain a warrant before the contested search occurred. The record demonstrates that they had focused their investigation on 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search warrant for one of these homes. As a result of their conversation with the AUSA, the officers decided that further surveillance on the two homes was necessary before they specifically selected one to search, and they proceeded to conduct that surveillance immediately. The officers' actions clearly indicate they took steps to obtain a search warrant and that they intended to obtain the warrant for either 1175 or 1179 East 76th Terrace as soon as possible.

The officers also possessed strong probable cause for their search of 1179 East 76th Terrace by the time Mr. Cunningham arrived at the home. Prior to that time, they had acquired background information about the alleged check-writing ring, narrowed their investigation to one residential block, and focused on the two homes sharing a common driveway. The officers' surveillance had uncovered the following additional information: a red car containing two individuals identified earlier in the investigation arrived, parked briefly, and then pulled out from

-11-

behind 1179 East 76th Terrace; a black pickup truck previously observed in the investigation was stopped containing Mr. Cunningham, who said that he lived at 1179 East 76th Terrace; the residents of 1175 East 76th Terrace told officers that the home next door had been receiving all of the traffic that evening, and the officers ruled out 1175 East 76th Terrace as the location visited by the alleged check supplier; and a gray Blazer previously observed in the investigation was seen parked by 1179 East 76th Terrace. The government thus had sufficient probable cause for a search of 1179 East 76th Terrace at the time of Mr. Cunningham's disputed consent to search his home.

Moreover, the officers ultimately did obtain a warrant, albeit based in part on information retrieved from inside Mr. Cunningham's home. There is also no evidence the officers "jumped the gun" due to a lack of confidence about probable cause and out of a desire to force the issue. *Id.* at 1204. Instead, the record indicates that the search occurred at the time it did because of the coincidental arrival of Mrs. Cunningham. Her presence on the scene led to a series of events that culminated in her son's release from jail, his return home, and his consent to search. As a result, we are satisfied the government has demonstrated that, as in *Souza*, but for Mrs. Cunningham's arrival at 1179 East 76th Terrace on the evening of the search, the officers would have obtained a search warrant and the evidence in question would have been found. *Id.* at 1205.

Our case is unlike the scenario in *Owens*, 782 F.2d at 151-53, where we declined to apply the inevitable discovery doctrine to the search of a motel room. In that case, police arrested the room's occupant, entered the room, and then opened and searched a drawer as well as a closed bag inside that drawer, ultimately discovering illegal drugs. *Id.* at 148-49. Although marijuana, white powder, and drug paraphernalia were also in plain view and the police had full control over the room, they made no attempt to seek a warrant. *Id.* at 149. Declining to apply the inevitable discovery doctrine, we concluded that the illegal searches of the drawer and bag tainted the only police investigation that was ongoing. Thus, there did not exist any prior and independent investigation that would have inevitably led to discovery of the concealed illegal drugs. *Id.* at 152. We also disagreed with the government that the motel's routine cleaning service would have inevitably revealed the concealed drugs. *Id.* at 152-53. We observed that the police's complete failure to comply with the warrant requirement although they had repeated opportunities to do so, "exemplif[ied] the very type of official conduct the exclusionary rule is intended to deter." *Id.* at 152. As discussed above, the officers' actions in the present controversy do not create the same problem.

We conclude by repeating our observation in *Souza* that "[i]n most cases, the failure of the police to secure a warrant will probably be fatal." 223 F.3d at

1206. We apply the inevitable discovery doctrine in this case only because we are convinced that without Mr. Cunningham's disputed consent, the warrant to search his house would have been issued and the incriminating evidence would have been discovered.

## III

For the foregoing reasons, we **AFFIRM** the decision of the district court denying Mr. Cunningham's motion to suppress.