**STATE of Missouri, Plaintiff–Respondent,**

v.

**Eddie Lee MARSHALL, Defendant–Appellant.**

No. SD 31463.

Missouri Court of Appeals, Southern District, Division One.

July 25, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 16, 2013.

Application for Transfer Denied Oct. 29, 2013.

Deborah B. Wafer, Office of the Public Defender, St. Louis, Mo, for Appellant.

Chris Koster, Attorney General, and Karen L. Kramer, Assistant Attorney General, Jefferson City, MO, for Respondent.

GARY W. LYNCH, P.J.

Eddie Lee Marshall ("Defendant") appeals his first-degree-murder conviction, *see* section 565.020,[1] for which he was sentenced to life imprisonment without the possibility of parole. Defendant presents five points on appeal, claiming that the trial court erred in (1) excluding a taped telephone conversation between Defendant and his sisters, as well as not granting a mistrial when, during closing arguments, the State argued that the jurors had not "heard any other explanation" for what happened to the victim; (2) admitting the

1. All statutory references are to RSMo 2000.

victim's out-of-court statements regarding her meeting with Defendant on the night of her murder; (3) overruling Defendant's motion to suppress all evidence obtained from his trailer; (4) overruling Defendant's motion to suppress Defendant's DNA samples; and (5) refusing to give an instruction on the lesser-included offense of voluntary manslaughter. Finding no merit in any of Defendant's claims, we affirm.

### Factual and Procedural Background

The first trial in this case ended in a mistrial after the jury informed the trial court it could not reach a unanimous verdict. In the second trial, viewed in the light most favorable to the verdict, *see State v. Cole,* 71 S.W.3d 163, 168 (Mo. banc 2002), the following facts were adduced.

Defendant and his wife, Penny Marshall,[2] moved to Doniphan, Missouri, from Oklahoma when Defendant took a job stringing electrical line for C and H Electric Company. Defendant and his wife took up residence in a trailer park owned by Bill Kenley. At some point, Defendant built a wire fence on the porch of his trailer to house his wife's two dogs. After finishing its construction, Defendant stored the hammer he used to construct the fence in an end table in the living room of his trailer.

Heather Donnell ("Victim") and her boyfriend, Brent Dees, also lived in Kenley's trailer park in a trailer adjacent to Defendant's trailer. The couple had been together nine years and had a young son. Defendant often spoke of Victim to his coworkers, saying that he would sit drinking on his porch until 2:30 a.m. or 3:00 a.m., watching Victim's house in the hope of seeing her through a window, and making several lewd and debasing comments

regarding the sexual liberties he wanted to take with Victim. Defendant insisted that Victim "wanted him[.]" On one occasion, Victim and her sister drove past Defendant's trailer and observed him standing on his porch, clad only in his underwear; when Defendant observed them driving by, he began "shaking his whole body at" them. On another occasion, Defendant told Victim and her sister they were beautiful and, if he were not with Penny, he would be with Victim.

In mid-April 2007, Defendant came to Victim's trailer and tried to purchase drugs from Dees. When Dees stated that he did not have any drugs, Defendant said he "hates a liar" and hit Dees in the jaw. Defendant then left.

On Saturday, April 21, 2007, Defendant was informed by Bill Kenley that he and his wife were being evicted from their trailer because Defendant was behind on his rent. Kenley told Defendant that he needed to vacate the trailer by Tuesday, April 24.

Sometime later that day, Defendant was driving his wife's truck inside the trailer park when he lost control of the vehicle while making a u-turn and ran the truck into a tree. Defendant was found to be drunk and was arrested. After the crash of her truck that day, Penny moved out of the trailer, upset by Defendant's drinking and recent arrest. Another resident of the trailer park took Penny, her dogs, and her personal effects to a nearby motel. Penny left Defendant a note.

When Defendant arrived at the jail after his arrest, he discovered that Dees, Victim's boyfriend, was being held there on an unrelated matter. Dees had been unable to make bond. The two men talked, and

2. Due to their common last name, Defendant's wife is occasionally referred to by her first name for purposes of clarity. No familiarity or disrespect is intended.

Defendant apologized to Dees for hitting him, asking for Dees's forgiveness. Defendant then offered to get money from his brother to make Dees's bond and, though Dees did not take Defendant's offer seriously, he did mention the offer while on the phone with Victim the following day.

The day after his arrest, Sunday, April 22, after getting released from jail, Defendant called a coworker, William Crutz, and asked him to help pull Penny's truck from the tree. Crutz arrived around noon and observed that the truck was "totaled." Defendant told Crutz that he had gotten drunk and wrecked the truck. Defendant also told Crutz that Penny had left him, and he blamed Victim.

That same day, Victim dropped off her son at the house of Dees's mother, Diane Silman, and went to work at the Casey's General Store in Doniphan. Victim told Silman she expected to get off work at 11:00 p.m. that night. While at work, Victim received two telephone calls. Immediately after receiving the second call, which occurred sometime between 6:00 p.m. and 6:30 p.m., Victim told a coworker, Sandra Hoefer, that she had the money to get Dees out of jail. Victim stated that she was going to get the money that night from the neighbor who had hit Dees.

After leaving work at 8:45 p.m., Victim went to a tattoo parlor, where she had a conversation with Julie Crook. The owner of the tattoo parlor, Belinda MacDonald, overheard Victim tell Crook that she was trying to meet a man named Eddie to get $3,000 in order to get Dees out of jail.

At 11:30 p.m., Silman became concerned because she had not heard from Victim, and Victim had never before failed to pick up her son after work or called to say she was running late. Silman called a few of Victim's friends in an attempt to locate her but was not successful. When she still had not heard from Victim the following morn-

ing, Silman drove to Victim's trailer to find Victim's blue Pontiac Aztek missing. No one answered when Silman knocked on the door of the trailer. She also knocked on Defendant's door but no one answered there, either. Silman then went to Victim's mother's trailer, but Victim's mother, Sherrie Gunter, knew nothing about her daughter's whereabouts. Gunter then went to the police department to file a missing persons report, but she was told that she could not do so because Victim had not yet been missing for twenty-four hours. When Gunter relayed this information to Silman, Silman made a missing persons report to the Ripley County Sheriff's Department.

Around noon that day, Monday, April 23, Raymond Dickson of the Ripley County Sheriff's Department, who had taken the missing persons report from Silman, went to the trailer park to try and make contact with Victim. In furtherance of that effort, Dickson knocked on Defendant's door, but no one answered. Dickson could hear what sounded to him like a radio or television playing inside the trailer.

Also on that day, Kenley became concerned that Defendant might have damaged the trailer, so he called the sheriff's department and asked for a deputy to accompany him to Defendant's trailer. Deputy Richie Phillips met Kenley outside of Defendant's trailer and, together, they went onto the porch. Kenley knocked on the door and called Defendant's name, but there was no answer. Deputy Phillips also knocked and shouted Defendant's name, but there was still no answer. They observed the wrecked truck next to the trailer and heard what sounded like a television playing inside the trailer. Kenley told Deputy Phillips that he was going to open the door with his passkey; when he did so, Kenley saw a body lying on the floor in

front of the couch. The body was surrounded by blood. At first, Kenley thought the body was that of Defendant because both the body and Defendant had long hair. Kenley stated, "Damn, this man is dead."

Deputy Phillips stopped Kenley from entering the trailer. After looking inside, Deputy Phillips informed Kenley that the body was that of a woman. Kenley then looked again and said, "Well, that's Heather. That's who you all have been looking for all day."

Deputy Phillips called for backup and, when another deputy arrived, the pair did a quick sweep of the trailer to make sure no one else was inside or injured. Deputy Phillips locked the door and called for the sheriff. Once the sheriff arrived, Deputy Phillips applied for a search warrant.

Upon execution of the search warrant, Victim was found lying on the floor in front of Defendant's couch, with her head close to the middle of the couch and her buttocks on the floor, and her body at an angle with the feet to the right and her arms above her head. She was lying on her right shoulder with her legs separated. Victim was wearing a white pullover with a pink t-shirt underneath and a neutral-colored bra. While the two shirts were still covering her breasts, the bra had been pulled up. Victim's pants and underwear were pulled down and left around her left ankle, and there was a feminine pad inside her underwear. Her left sock and shoe were still on, but her right sock and shoe had been removed. The arm of the couch was soaked in blood, and there was blood spatter on the wall across from the couch and on the floor. There was also a large puddle of blood and brain matter on the floor around Victim's body. Red licorice was scattered on the floor around Victim's body, and dark hair was clenched in Victim's hands and on her torso.

Within just a few inches from Victim's feet, officers found a telephone and a telephone book opened to the page containing the listing for the Doniphan Casey's General Store. An officer hit "redial" on the telephone and found that the last number called was, in fact, the Casey's General Store in Doniphan. Officers also found standing water in the bathtub and the note Penny had left for Defendant the previous Saturday.

Officers searched Victim's trailer and found no licorice. They also searched the entire trailer park for Victim's vehicle but did not locate it. The Missouri Highway Patrol then sent out messages to Oklahoma and Arkansas law enforcement asking them to look for Victim's vehicle; Defendant had relatives in both states.

That same day, Richard Morton was driving south on Highway 7 in Arkansas between Harrison and Russellville. He saw Defendant walking beside the highway and offered him a ride, as it was starting to get dark. Defendant carried two bags, one of which he threw into the back of Morton's car. Defendant told Morton he was headed to the Russellville area to see his brother and hopefully find a job. Defendant also stated that his truck had broken down on the highway near Harrison. Defendant asked Morton if he could use Morton's cell phone to call a family member for a ride, and he had Morton drop him off at the corner of Highway 7 and the Interstate 40 overpass just north of Russellville. Defendant's brother, Troy Marshall, and his son picked up Defendant; Defendant did not offer them an explanation as to why he was in Arkansas.

The following day, April 24, Victim's car was located in a parking lot about five miles south of Harrison. The keys were inside the vehicle. The vehicle was towed to an indoor facility and searched. Hair

and licorice packages were seized from the interior of the vehicle; no licorice had been found inside Victim's trailer.

Defendant was arrested later that day at his brother's home in Atkins, Arkansas. Licorice was found in Defendant's backpack. Two sergeants from the highway patrol traveled to Arkansas to interview Defendant. Defendant was read his *Miranda*[3] rights and agreed to speak with authorities. Defendant told the sergeants that the day after his wife moved out of their trailer, he had been evicted, so he walked or hitchhiked to Arkansas to work with his brothers. Defendant stated that his vehicle had been in an accident and was not drivable.

Defendant then asked why the sergeants were there. They explained that they were investigating a homicide and that a woman's body had been found inside his trailer in Ripley County, Missouri. Defendant asked if the body was that of his wife, to which the sergeants responded that it was not. The interview was then stopped, and Defendant was taken to a more secure location. As he was taken away, Defendant told the sergeants "to remember there were two sides to every story."

An autopsy revealed that Victim suffered multiple blunt force injuries to her head, primarily on the left side, and she died from blunt force trauma to the head. The most significant injury was a gaping wound behind the left ear, which measured five to six centimeters in diameter. The skin was torn open, and the skull was visibly fractured; brain matter had come out of the wound into Victim's hair. Victim also had two lacerations on the left side of her scalp, one in the middle of her forehead, and a circular abrasion imprint on her left temple. The abrasion indicated

that Victim had been struck by an object with a circular face, consistent with the head of a hammer. Victim also had scattered abrasions and contusions on the backs of her fingers, a broken left ring finger, and abrasions on her left forearm and knee. These injuries were consistent with defensive wounds.

The jury found Defendant guilty of first-degree murder, and the trial court sentenced him to life in prison without the possibility of parole. After the denial of Defendant's motion for new trial, this appeal timely followed. Additional facts necessary to the disposition of this appeal are set out in the discussion of Defendant's points.

### Discussion

Defendant raises five points for our review. We address them in the order presented.

### No Error in Exclusion of Taped Telephone Conversation

■ Defendant first claims that the trial court erred in excluding a taped telephone conversation between Defendant and his sisters in which Defendant stated that Victim's killer was someone whom Victim and Dees had "ratted on for methamphetamine." Defendant contends that the tape should have been admitted pursuant to the rule of completeness and because, having been introduced into evidence during his first trial, its relevance had already been demonstrated. Defendant further claims that the trial court erred in overruling his request for a mistrial following the State's argument that the jury heard "no other explanation" for Victim's death because it violated Defendant's right not to testify.[4]

---

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. "Multiple claims of error in one point relied on render[] the point multifarious and as such is a violation of Rule 84.04, made appli-

Defendant is incorrect on both claims, as the taped conversation constituted inadmissible self-serving hearsay and the State's comment during closing argument was not an infringement on Defendant's right not to testify.

During trial, Defendant moved to admit into evidence Exhibit C, a taped telephone conversation between Defendant and members of his family that occurred while Defendant was incarcerated in the Butler County Jail awaiting trial on this charge, and Exhibit D, a transcript of that taped conversation. The State objected to their admission on the basis of hearsay, namely that the tape consisted only of self-serving statements being offered for their truth. The State also objected that no one heard speaking on the tape was available for cross-examination. Defendant argued that because the tape had been admitted at the State's request during his first trial, its relevance had already been established, so that therefore, if it was admissible when offered by the State in the first trial, it was admissible when offered by the defense during the second trial. The trial court sustained the State's objection, stating that the tape did not fall within an exception to the hearsay rule and consisted of self-serving hearsay statements.

The taped conversation, in pertinent part, is as follows:

[Defendant]: . . . listen, I wasn't even in the trailer, I just wrecked my truck. I wasn't even there. . . .

\* \* \*

Jeannie: How did you have her car, Eddie?

[Defendant]: Jeannie, I freaked, listen, I can't talk on the phone.

\* \* \*

Jeannie: People make mistakes.

[Defendant]: Listen, this ain't my mistake. This is the dude her and her old man ratted on. And they used my empty trailer as a, a, as a place.

\* \* \*

[Defendant]: Hey, Jeannie, they ratted on a lot of people, and the ones they ratted on said that the minute either one, they'd see either one, that, that would happen. Well, the old lady just left me. I wrecked my truck into that tree. I wasn't even at the house. I went to jail the night before. You know what I mean? They just used my goddamn trailer, and now I'm fucked.

Jeannie: And they said that you called the neighbor, called her and had her come over.

[Defendant]: Bull shit [sic], for what? Jeannie that's bullshit, man. I don't care what they say. I don't care what they say.

cable to briefs in criminal appeals by Rule 30.06(c)." *State v. Garrison*, 276 S.W.3d 372, 379 n. 4 (Mo.App.2009). Such a violation generally preserves nothing for appellate review and subjects the offending point relied on to dismissal. *Id.* Nevertheless, because we are able to separately discern each of Defendant's claims and arguments, we review Defendant's first point *ex gratia*. We do not address any claim, as inferred by Defendant in his argument, however, that the exclusion of the taped conversation was a basis upon which the trial court should have granted a mistrial in response to the State's statement in closing argument, because that basis was not preserved for appellate review by a proper and timely objection asserting it and by inclusion in Defendant's motion for new trial. *See State v. Chambers*, 234 S.W.3d 501, 512 (Mo.App.2007) (quoting *State v. Petty*, 967 S.W.2d 127, 140 (Mo.App.1998)) ("The general rule with respect to preservation of error is that an objection stating the grounds must be made at trial, the same objection must be set out in the motion for new trial and must be carried forward in the appeal brief to preserve it."); *see also* note 6, *infra*.

* * *

Jeannie: He said it wasn't him. He wasn't even there and that it was somebody else that used his empty trailer.

[Defendant]: The dude they ratted on.

* * *

[Defendant]: Yeah, but they don't got the truth about how they ratted on these guys for methamphetamine.

Jeannie: Uh-huh.

[Defendant]: They don't have all the truth. That I wasn't even in the stinking trailer.

Jeannie: Where was you, can you prove it?

[Defendant]: Jeannie, hell yes, I can prove it. I just wrecked that truck. I couldn't do nothing.

Jeannie: He wasn't even there, he said, he said he just wrecked that truck and just, were you out of jail when it happened?

[Defendant]: I just got out of jail.

Jeannie: That's what they said. They said you told that girl you, they said you told that girl you just got out of jail. You called her at her job and that you called her at her job and told her you just got out and if she wanted to come over, you knew a way to get up the money and help get him out.

[Defendant]: No, I didn't. That's all bull shit [sic]. I talked to him in jail and I said, "Listen, I'm leaving. If you guys want all that furniture and that TV in there, go ahead and fucking get it." When I finally got home and opened that door and seen that, Jeannie, I panicked and left. That's what happened, but I can't talk about it, I can't talk about it.

* * *

[Defendant]: Hey Brenda, listen, sis. When I got there, and I opened that door and see that, I panicked and freaked. I talked to her old man in jail. I went to jail for wrecking my truck.

Brenda: Right, that's what they told, they told that.

[Defendant]: Like I told her, I told him, listen, my wife just left, left me, and I'm leaving, too, and you guys can have all that furniture and shot [sic] out of that trailer. So whoever took her over there to get that fucking furniture, that's who did it. I didn't get home til about 11 o'clock. When I finally did open that door, I panicked. Jumped in the first vehicle and left.

Brenda: Okay.

[Defendant]: Sis, that's what happened.

* * *

Brenda: They asked me about some guys you worked with and I said I don't know about any guys he worked with.

[Defendant]: Well, they're the ones that all have the paper clippings of her and her old man ratting on everybody for methamphetamine. I don't have nothing to do with it.

* * *

Brenda: You see the paper said this morning that they didn't know if she died Sunday night or Monday morning. And I asked that guy yesterday. I said, "[W]ell, how in the hell did he get here so damn fast if he lived way up there in fricking Missouri."

[Defendant]: Sis, I just panicked and left. That's all. I drove til I ran out of gas and that was it.

The decision whether to admit proffered evidence is left to the broad discretion of the trial court. *State v. Clark*, 197 S.W.3d 598, 599 (Mo. banc 2006). We will only find error when such a decision is determined to be an abuse of that discretion. *Id.* An abuse of discretion occurs when a

ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable that it shocks one's sense of justice and indicates a lack of careful consideration. *Id.* Where reasonable persons can disagree about the propriety of a decision, there is no abuse of discretion. *State v. Johnson,* 207 S.W.3d 24, 40 (Mo. banc 2006).

"A statement may be admitted as an admission of a party opponent if the statement is material to the issues of the case, the statement is relevant to the case, and the statement is offered by the opposing party." *State v. Floyd,* 347 S.W.3d 115, 124 (Mo.App.2011) (quoting *State v. Brown,* 833 S.W.2d 436, 438 (Mo.App. 1992)). Accordingly, the taped conversation containing Defendant's statements was admissible as an admission of a party opponent when offered into evidence by the State in the first trial. On the other hand, when offered by Defendant in the second trial, even though it may have been relevant as Defendant argues, it was not admissible as an admission of a party opponent because it was not being "offered by the opposing party." *See id.*

■ As a general rule, "[a] defendant cannot create exculpatory evidence by introducing self-serving, hearsay statements[.]" *State v. Beishline,* 920 S.W.2d 622, 626–27 (Mo.App.1996) (citing *State v. Sweet,* 796 S.W.2d 607, 614 (Mo. banc 1990)). Defendant's statements to his sisters that he was not the perpetrator, as well as his suggestions that someone whom Victim and her boyfriend had "ratted on" was, are self-serving hearsay statements. They are, therefore, inadmissible, and the trial court was well within its discretion to exclude them from trial.[5]

■ Defendant's contention that the rule of completeness compels the admission of the taped conversation is misguided. The rule of completeness provides that "where either party introduces part of an act, occurrence, or transaction, the opposing party is entitled to introduce or inquire into other parts of the whole." *State v. Jackson,* 313 S.W.3d 206, 211 (Mo. App.2010). This is to ensure that no evidence is admitted out of context. *Id.* Defendant claims that the State "opened the door" to admission of the taped conversation when it introduced evidence of Defendant's conversation with law enforcement officers and his statement that there are "two sides to every story[,]" as well as when it introduced evidence that Defendant attempted to buy drugs from Dees. The taped conversation, however, is not part of the same "act, occurrence, or transaction" as either instance claimed by Defendant; Defendant's statements to the officers occurred two days before Defendant's conversation with his sisters, and the attempted drug purchase occurred over ten days before the taped conversation. Under Defendant's mistaken and tortured application of the rule of completeness, essentially any statement of a defendant offered by the State would open

---

5. Defendant's statements implicating another, unspecified individual in Victim's murder could also have been excluded on the ground that evidence suggesting someone else committed a crime is generally inadmissible absent some indication directly tying that third party to the crime at hand. *See State v. Davidson,* 982 S.W.2d 238, 242 (Mo. banc 1998); *see also State v. Rousan,* 961 S.W.2d 831, 848 (Mo. banc 1998) ("The evidence must be of the kind that directly connects the other person with the *corpus delicti* and tends clearly to point to someone other than the accused as the guilty person. Disconnected and remote acts, outside the crime itself cannot be separately proved for such purpose; and evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible.") (internal quotation marks and citation omitted).

the door to any other statement by a defendant, no matter how self-serving or otherwise inadmissible that statement may be. That is not the law, and the trial court did not err in excluding the taped conversation for that reason.

Defendant also claims that the trial court erred in overruling his request for a mistrial when, during closing argument, the State argued that the jury had heard "no other explanation" for Victim's death. Defendant contends that the statement infringed upon his right not to testify.

As is the case with a decision to exclude evidence, the decision to grant a mistrial rests within the broad discretion of the trial court, and we will reverse the trial court's ruling only in the event of an abuse of that discretion. *State v. Blevins*, 385 S.W.3d 526, 528 (Mo.App.2012). The grant of mistrial is a drastic remedy, one used in extraordinary circumstances in order to cure grievous prejudice for which there is no other solution. *Id.*

■ The State may not, either directly or indirectly, comment on a defendant's decision not to testify. *State v. Barton*, 998 S.W.2d 19, 28 (Mo. banc 1999); § 546.270. A direct reference is a "straightforward, definite, and certain" reference in which the words "defendant," "accused," or "testify," or their equivalent, are used. *State v. Neff*, 978 S.W.2d 341, 344 (Mo. banc 1998). An indirect reference is one "reasonably apt to direct the jury's attention to the defendant's failure to testify." *Id.* The State may, however, comment on a defendant's failure to offer evidence, so long as there is no reference to the defendant's failure to testify. *State*

*v. Phillips*, 940 S.W.2d 512, 519 (Mo. banc 1997). The State's comment that the jury had heard "no other explanation" for the events leading to Victim's death falls into the latter category. The State was not commenting on defendant's failure to testify but rather his failure to produce admissible evidence refuting the State's version of events. Such a comment was appropriate, and the trial court did not abuse its discretion in denying Defendant's request for a mistrial. Defendant's first point is denied.[6]

### *No Error in Admission of Victim's Out–of–Court Statements*

■ In his second point, Defendant claims that the trial court erred in admitting Victim's out-of-court statements—through the testimony of Sandra Hoefer and Belinda MacDonald—that she was going to meet Defendant to obtain money to get her boyfriend out of jail because such statements were inadmissible hearsay and prejudiced Defendant by injecting his intent into the proceedings. We disagree because the statements are not hearsay.

■ As a general rule, hearsay statements are inadmissible. *State v. Shurn*, 866 S.W.2d 447, 457–58 (Mo. banc 1993). "A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value." *State v. Forrest*, 183 S.W.3d 218, 224 (Mo. banc 2006) (internal quotation marks omitted). "[A]n out-of-court statement that is not offered for the truth of the matter asserted is not hearsay and is, therefore, admissible even though it does

---

**6.** Defendant also claims, for the first time on appeal, that the State's comment during closing argument was inappropriate because it was the State's objection that kept an alternative version of events, i.e., the taped telephone conversation, from being presented to the jury. Because this issue was not raised in the objection at trial and in the motion for new trial, it is reviewable only for plain error, which Defendant has not requested. *See State v. Davis*, 348 S.W.3d 768, 770 n. 4 (Mo. banc 2011).

not fall within a recognized exception" to the hearsay rule. *State v. Douglas,* 131 S.W.3d 818, 823–24 (Mo.App.2004). "Testimony of what another said offered in explanation of conduct rather than as proof of the facts in the other's statement is not inadmissible hearsay." *State v. Murray,* 744 S.W.2d 762, 773 (Mo. banc 1988).

Here, the statements of both Hoefer and MacDonald were not offered for their veracity—that is, they were not offered to prove that Defendant was going to give Victim money to get Dees out of jail—but rather were offered to explain Victim's conduct, i.e., why she went to Defendant's trailer on that Sunday evening. Thus, both Hoefer's and MacDonald's statements were admissible. Defendant's second point is denied.

### No Error in Admitting Evidence Discovered in Defendant's Trailer

■ In his third point, Defendant claims that the trial court erred in overruling his motion to suppress evidence discovered in his trailer and his objections at trial to its admission because such evidence was discovered pursuant to an illegal search. Defendant argues that Deputy Phillips's initial entry into the trailer, during which Victim's body was discovered, was conducted without a warrant or Defendant's consent, and therefore the subsequent search warrant and search of the trailer were improper and all evidence discovered in the trailer should have been excluded at trial. Defendant is mistaken, as the initial entry into Defendant's trailer was made by a private citizen, not a state actor, and the Fourth Amendment does not apply.

We review the trial court's ruling on a motion to suppress for "substantial evidence" supporting the ruling. *State v. Rousan,* 961 S.W.2d 831, 845 (Mo. banc 1998). "[T]he facts and reasonable inferences from such facts are considered favorably to the trial court's ruling and contrary evidence and inferences are disregarded." *State v. Galazin,* 58 S.W.3d 500, 507 (Mo. banc 2001). We consider the evidence presented at both the suppression hearing and at trial, and we defer both to the trial court's factual findings and the trial court's superior position in determining witness credibility. *State v. Gaw,* 285 S.W.3d 318, 319–20 (Mo. banc 2009). We review all questions of law *de novo. Id.* at 320.

The Fourth Amendment gives protection against unlawful searches and seizures, and ... its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; as against such authority it was the purpose of the Fourth Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued.

*Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921).

■ "But it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." *Coolidge v. New Hampshire,* 403 U.S. 443, 488, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Thus, "the protection of the [F]ourth [A]mendment against unreasonable search and seizure does not apply to actions of private individuals not acting pursuant to a request by the police[,]" no matter how unreasonable the search. *State v. Brasel,* 538 S.W.2d 325, 330 (Mo. banc 1976); *see also United States v. Poe,* 556 F.3d 1113,

1123 (10th Cir.2009). A private search, however, "may be transformed into a governmental search implicating the Fourth Amendment if the government coerces, dominates[,] or directs the actions of a private person conducting the search of seizure." *United States v. Smythe,* 84 F.3d 1240, 1242 (10th Cir.1996) (internal quotation marks and citation omitted). A two-pronged inquiry is utilized to determine whether a search conducted by a private citizen constitutes state action. First, we examine "whether the government knew of and acquiesced in the [individual's] intrusive conduct." *United States v. Souza,* 223 F.3d 1197, 1201 (10th Cir.2000) (internal quotation marks and citation omitted). If the answer is yes, we must then determine "whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *Id.* "Both prongs must be satisfied considering the totality of the circumstances before the seemingly private search may be deemed a government search." *Poe,* 556 F.3d at 1123. "If a government agent is involved merely as a witness, the requisite government action is absent and the search will be deemed private." *Souza,* 223 F.3d at 1201 (internal quotation marks and citation omitted).

The trial court found as a historic fact that Bill Kenley made the initial warrantless entry into Defendant's trailer acting as a private citizen within his rights as Defendant's landlord. These findings were supported by substantial evidence. At the time in question, both Defendant and Victim were renting trailers in Kenley's trailer park. Kenley entered into oral agreements with all of his tenants giving him the right to access each trailer using a spare set of keys. Shortly before Victim's death, Kenley asked Defendant to vacate his trailer and, being fearful of Defendant and worried that Defendant might have damaged the trailer, Kenley requested assistance from the sheriff's department in approaching Defendant's trailer. After both Kenley and Deputy Phillips knocked on Defendant's door and received no response, Kenley used his key to unlock the door. Upon Kenley opening the door, both he and Deputy Phillips saw Victim's body, and Deputy Phillips prevented Kenley from entering the trailer. After securing the trailer, Deputy Phillips obtained a search warrant. While Deputy Phillips obviously knew that Kenley was approaching Defendant's trailer and planned to enter using his key, Deputy Phillips's presence at Defendant's trailer was entirely at the behest of Kenley, and Deputy Phillips did nothing to coerce, dominate, or direct Kenley's actions until after Kenley had opened the door and the two men saw Victim's body. Kenley's actions were undertaken to ascertain if the trailer had sustained damage at the hands of Defendant pursuant to Kenley's request that Defendant vacate the trailer, and Deputy Phillips accompanied Kenley as a witness based upon Kenley's fear of Defendant.

Based upon the above, Kenley's entry into Defendant's trailer was made as Defendant's landlord and a private citizen and, therefore, the Fourth Amendment does not apply.[7] As such, the trial court's denial of Defendant's motion to suppress all evidence obtained pursuant to the search of Defendant's trailer and its admission of that evidence at trial was supported by substantial evidence. *See Rou-*

7. Defendant's reliance upon *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), is misplaced because it is easily distinguishable. There, although they had the landlord's consent, it was law enforcement that made the actual warrant-less entry into the defendant's home. *Id.*

*san,* 961 S.W.2d at 845. Defendant's third point is denied.

### No Error in Admitting Defendant's DNA Samples

In his fourth point, Defendant claims that the trial court erred in overruling his motion to suppress and his objections at trial to the admission of his DNA samples, which were taken pursuant to a warrant that Defendant argues was not based on probable cause. Defendant contends that, at the time the warrant for his DNA samples was issued, it was unknown whether the perpetrator's DNA was present on Victim, and thus the warrant was "based on nothing more than possibility, conjecture[,] and supposition." We disagree.

When Victim's body was discovered, dark hair was clenched in both of her hands, and blood was covering Victim and the surrounding area. The investigator searching the trailer, Dennis Overbey of the Missouri State Highway Patrol, swabbed Victim's body for DNA, even though no saliva or semen was visible. The resulting application for a search warrant for Defendant's DNA sample stated that Victim's body had been found in Defendant's trailer, that she intended to meet up with Defendant the night before she was found, that she died of blunt force trauma to the head, and that "Law Enforcement found on or about [Victim's] body certain items which may contain DNA which could be related to the person or persons who caused her death." The accompanying affidavit provided that the hairs found in Victim's hands were believed to belong to Defendant, that Victim's defensive wounds indicated that the perpetrator's DNA might be present on her body, and that the position of Victim's body indicated a possible sexual assault with the potential for the presence of the perpetrator's DNA. At the time the application for a search warrant for Defendant's DNA was made, Defendant had already been arrested and remained in custody, and a buccal swab and hair sample was requested "to further complete the investigation and allow the crime lab to analyze the evidence that ha[d] been seized." The search warrant was issued on May 1, 2007. The samples were obtained the following day, and subsequent DNA testing revealed a profile consistent with that of Defendant on both of Victim's breasts, on her buttocks, on her pubic region, and between Victim's legs. Defendant's DNA profile is observed in 1 in 45.5 quintillion individuals in the Caucasian population. The trial court denied Defendant's motion to suppress the DNA evidence taken from Defendant.

The Fourth Amendment dictates that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. *See also* Mo. Const. art I, § 15 (1945); section 542.276. Whether probable cause for a search warrant exists in any particular case is a question of fact. *State v. Berry,* 801 S.W.2d 64, 66 (Mo. banc 1990). As such, we give "great deference on review to the initial judicial determination of probable cause made at the time of the issuance of the warrant and we reverse only if that determination is clearly erroneous." *Id.*

Our review for the existence of probable cause is confined to the four corners of the search warrant application and any accompanying affidavits, thus limiting our examination to the same documents available to the issuing judge. *State v. Neher,* 213 S.W.3d 44, 49 (Mo. banc 2007).

The test for determining whether probable cause has been established for the

issuance of a search warrant is the totality of the circumstances. In dealing with probable cause, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Search warrants, therefore, should not be deemed invalid by interpreting affidavits in a hypertechnical rather than common sense manner. As such, the issuing magistrate must make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*State v. Buchli*, 152 S.W.3d 289, 305 (Mo. App.2004) (internal quotation marks and citations omitted).

The totality of the circumstances, as set forth in the search warrant application and accompanying affidavit, supports the trial court's decision overruling Defendant's motion to suppress and his trial objections to the admission of his DNA samples. The search warrant application and affidavit asserted that Victim's body was found in Defendant's trailer; that Victim intended to meet with Defendant the night before her body was found; that several long hairs similar to that of Defendant were found clenched in Victim's hands; that Victim's pants and underwear had been pulled down and left around one ankle, completely removed from one leg; that the condition of the crime scene and position of Victim's clothing and body indicated a possible sexual assault; that the autopsy had revealed numerous defensive wounds on Victim's body, with the potential for the perpetrator's DNA to have been deposited; and that law enforcement officials believed Defendant to be the perpetrator. It is not unreasonable—and is within the realm of common sense—that the issuing judge extrapolated from these assertions that a fair probability existed that Defendant's DNA was present on Victim's body, and a sample of his DNA was necessary to complete the investigation into Victim's murder.

Defendant makes much of the fact that, at the time the warrant was issued, it had not yet been determined whether unknown DNA was actually present on Victim's body. This argument is misguided, as all that is necessary for the issuance of a search warrant is either direct or circumstantial evidence of a fair probability of the presence of evidence of a crime, not a certainty. The evidentiary assertions in the search warrant application and accompanying affidavit more than adequately meet such a threshold. Defendant's fourth point is denied.

### No Error in Refusal to Submit Additional Lesser–Included– Offense Instruction

In his final point, Defendant claims that the trial court erred in refusing to submit his proffered Instruction A— voluntary manslaughter—to the jury as a lesser-included offense.[8] Defendant argues that the evidence supports his proffered instruction and that the trial court's refusal to submit his requested instruction to the jury deprived him of a viable defense. We disagree.

---

8. While Defendant's point discusses the failure to submit two instructions—second-degree murder and voluntary manslaughter—to the jury, a review of the record reveals that if Defendant's proffered Instruction A had been accepted by the trial court, his proffered Instruction B—second-degree murder without sudden passion—would have necessarily been accepted, as well, as it consisted of a required alteration of the second-degree-murder instruction in cases where voluntary manslaughter is also instructed. This is the basis of Defendant's claim that two of his proffered instructions were improperly rejected. We refer to only Instruction A in our analysis with the understanding that our resolution of

At the close of Defendant's case, both Defendant and the State submitted proposed jury instructions to the trial court. The State proffered instructions on both first- and second-degree murder, and Defendant agreed that the proffered instructions for each tracked the Missouri Approved Instructions sanctioned by our Supreme Court. Defendant proffered Instruction A, which would have instructed the jury as to the offense of voluntary manslaughter. The trial court rejected it, finding that no evidence of the required sudden passion arising from adequate cause had been introduced. The trial court then accepted the State's proffered instructions on both first- and second-degree murder. Neither submission is challenged by Defendant in this appeal.

 The "refusal to submit a tendered jury instruction is within the trial court's discretion." *State v. Smith,* 949 S.W.2d 901, 905 (Mo.App.1997). We review the trial court's refusal to submit an instruction only for an abuse of that discretion. *State v. Davis,* 203 S.W.3d 796, 799 (Mo.App.2006). As discussed *supra,* "A trial court abuses its discretion if the ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* "[I]nstructional error is reviewed for an error in submitting the instruction *and prejudice." State v. Johnson,* 284 S.W.3d 561, 572 (Mo. banc 2009) (emphasis added).

Regardless of the propriety of the trial court's refusal to submit Instruction A to the jury, which we do not decide, Defendant cannot show that he was prejudiced by that refusal. "The failure to give a different lesser-included offense instruc-

that instruction necessarily resolves his

tion is neither erroneous nor prejudicial when instructions for the greater offense and *one* lesser-included offense are given and the defendant is found guilty of the greater offense." *Id.* at 575. Second-degree murder is an established lesser-included offense of first-degree murder, *see id.* at 575–76, and the jury in this case was instructed on both first- and second-degree murder. Because the jury was given a lesser-included offense but still found Defendant guilty of the greater offense—first-degree murder—the trial court's refusal to instruct the jury on voluntary manslaughter cannot be considered either erroneous or prejudicial. *See id.* at 575. Defendant's fifth point is denied.

### Decision

Defendant's conviction is affirmed.

NANCY STEFFEN RAHMEYER and WILLIAM W. FRANCIS, JR., JJ., concur.

claims as to Instruction B, as well.