

# In the Missouri Court of Appeals Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED100616 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | Honorable Joan L. Moriarity |
| EDWARD WALKER, | ) | |
| | ) | |
| Appellant. | ) | FILED: November 18, 2014 |

The defendant, Edward Walker, appeals the judgment of the Circuit Court of the City of St. Louis following his conviction by a jury of the class-A felony of second-degree murder, in violation of section 565.021 RSMo. (2000), and the unclassified felony of armed criminal action, in violation of section 571.015.[1] The jury convicted the defendant in connection with the shooting death of Gene Wright. Pursuant to the jury's recommendation, the trial court sentenced the defendant to consecutive terms of imprisonment of 30 years and 15 years, respectively.

The trial court allowed the State to question venirepersons extensively about whether they could recommend a life sentence without parole if they convicted the defendant of first-degree murder. But the court prohibited the defendant from asking during *voir dire* whether the venire members could consider the entire range of punishment if the defendant were convicted of second-degree murder. We conclude that the trial court abused its discretion. Thus, we remand

---

[1] All statutory references are to RSMo. (2000) except as otherwise indicated.

the cause for a new penalty phase of the trial for second-degree murder and for resentencing on that offense. We affirm the judgment in all other respects.

Facts

The defendant, a native of the St. Louis area, served as a lance corporal in the United States Marine Corps at Camp Pendleton, California. In California, the defendant became acquainted with the victim, Gene Wright, an aspiring rap artist, and the defendant undertook management and promotion of the victim's music career. According to the defendant, the men frequently argued, and the victim owed the defendant roughly $5,000 to $7,000 in connection with money the victim had borrowed to advance his musical endeavors. The defendant also described an occasion at a night club when he saw the victim engage in an altercation with others and fire shots at their car.

In order to pay the defendant, the victim devised a plan whereby the two men would use a rental car to transport five pounds of marijuana to St. Louis to sell. The defendant agreed to the plan, and the two men drove from southern California to St. Louis in early February 2011. After arriving in St. Louis, the victim insisted that the defendant drive him to the arranged location to collect the money for the drugs. The defendant did so.

The defendant testified that he and the victim began arguing on the way to their destination. The defendant explained that he and the victim argued over money, and that the victim acted in a hostile manner, appeared threatening, and attempted to dominate the defendant as he often had during previous arguments. The defendant stated that the two men continued to argue for about ten minutes after arriving at their destination, that the victim continued yelling at the defendant outside the car, and that the victim continued yelling as he retrieved his jacket from the car and placed his gun in his jacket pocket. The defendant testified, "It was like he was

2

dominating me, talking aggressively to me, hostile to me and then he pointed a weapon at me." The trial court sustained the State's hearsay objection and precluded the defendant from stating expressly what the victim had said to him immediately before the shooting.

The defendant testified that the victim began walking away from the car, then drew his gun, raised, and aimed it at the defendant. The defendant stated he "thought that was an imminent threat on [his] life," so he shot the victim in self-defense. He explained that his combat training as a Marine took over, and that he automatically shot the victim repeatedly as he had been trained to do until the threat ceased. The defendant testified that he took the victim's gun and immediately left the scene. He abandoned the rental car the men had driven from California, and set it afire in a wooded area. He stated that he threw both his gun and the victim's gun into the river near the location where he left the car.

An eyewitness, C.M., testified for the State. He stated that he was in the front room of his home, located on the street where the defendant and the victim drove to collect the money. He noticed two men in a car parked in front of his neighbor's house. C.M. saw the victim get out of the car, "skip" around to the driver-side backseat, and retrieve a jacket from the car. C.M. stated that the victim then "skipped" toward the middle of the street, and the driver "jumped out of the car and started shooting." C.M. testified that the victim never turned toward the defendant, that he did not see a gun in the victim's hand, and that the defendant did not take anything from the victim's body or from the ground near him. He also stated that he did not observe a fight or argument between the two men. C.M. identified the defendant as the shooter.

After disposing of the car and the weapons, the defendant flew back to California that night, and returned to work at Camp Pendleton the following day. The defendant told his supervisor that he had left the area without permission over the weekend, and that the last person

3

to see him had been shot. Agents from the Naval Criminal Investigative Service were informed, and they contacted St. Louis police and interviewed the defendant at the request of the police. The defendant later told his supervisor that he had shot the victim because the victim owed him $20,000, and he admitted setting the car afire.

The State charged the defendant with first-degree murder and armed criminal action. Pursuant to the State's motion *in limine*, the trial court precluded the defendant from questioning the members of the venire about their ability to consider the full range of punishment in the event the jury found the defendant guilty of second-degree murder. But the trial court then allowed the State to question the members of the venire extensively about their ability to assess the mandatory sentence of life imprisonment without the possibility of parole in the event the jury found the defendant guilty of first-degree murder. In addition to questions of this nature presented to the entire venire, the State expressly addressed the issue with 29 individual panelists.

Without objection, the trial court stated that it would submit instructions for second-degree murder and accompanying armed criminal action. During its guilt-phase deliberations, the jury sent a note to the trial court asking about the penalty for second-degree murder. The trial court responded that the jury should be guided by the instructions as given. Unlike the instruction for first-degree murder, the instruction for second-degree murder did not address the range of punishment, nor had the jurors received this information during *voir dire* as they did with the first-degree murder charge.

The jury convicted the defendant of second-degree murder and armed criminal action. After about two hours of penalty-phase deliberations, the jury reported to the court that it was deadlocked as to punishment for second-degree murder. The trial court gave the hammer

4

instruction regarding punishment over the defendant's objection. The jury then recommended a sentence of 30 years of imprisonment for second-degree murder and a sentence of 15 years for armed criminal action. The trial court sentenced the defendant to consecutive terms of imprisonment of 30 years and 15 years accordingly. The defendant appeals.

## Discussion

In two points on appeal, the defendant challenges the trial court's ruling limiting *voir dire* and seeks plain-error review of the trial court's ruling prohibiting him from testifying to what the victim said to him immediately before the shooting.

*Restriction On Voir Dire Regarding*
*the Range of Punishment for Second-Degree Murder*

In his first point, the defendant challenges the trial court's ruling on the State's motion *in limine* to limit *voir dire* by precluding the defense from questioning the venirepersons about whether they could follow the instruction for second-degree murder, and whether they could consider the entire range of punishment—ten to 30 years or life imprisonment—for that offense.[2] The defendant argues that the trial court's ruling deprived him of the opportunity to discover bias, prejudice, or impartiality on this issue, and the opportunity to intelligently exercise his peremptory strikes. He contends that the jury's deadlock regarding the punishment for second-degree murder, resolved only after a hammer instruction from the court, demonstrates that a real probability of injury exists from the trial court's ruling.

Immediately before *voir dire* commenced, the parties argued the State's motion *in limine*.

> [PROSECUTOR]: Judge, I have one more issue.
> THE COURT: Okay.
> [PROSECUTOR]: [Defense counsel] and I spoke before we started about a possible question concerning range of punishment for murder in the second-degree. I don't think it's an appropriate question to ask.

---

[2] Section 558.011 RSMo. (Supp. 2013) provides a range of punishment of ten to 30 years or life imprisonment for a class-A felony such as second-degree murder.

The charges here are murder in the first-degree and armed criminal action. He has chosen jury sentencing, so he should get the range on both of those charges, but not on a possible lesser included instruction. Especially when that hasn't been charged.

*So I would ask for a motion* [sic] *in limine, at this time precluding any question as to the range of punishment for murder in the second-degree.*

THE COURT: [Defense counsel]?

[DEFENSE COUNSEL]: Your Honor, I think that by law and also by fact, the instruction for murder in the second-degree, I do anticipate, will be given to this jury. And I think just so that we have the ability to make informed decisions about if the jury can follow the law, I think it should be allowed to ask that if an instruction number [sic] in the second degree is given, that task, if they can follow the range of punishment on that charge.

THE COURT: Your response?

[PROSECUTOR]: Judge, they don't really get that. They shouldn't be able to consider range of punishment to get to murder second. That's not a reason to get to murder second. They have to decide first, whether he's guilty or he should be acquitted of murder first. So we shouldn't—they should be able to use that rationale to be a qualified juror.

THE COURT: Right. I'm going to grant the motion *in limine* on that issue.

(Emphasis added). The State requested a ruling prohibiting the defense from asking *any* question regarding the range of punishment for second-degree murder, and the trial court granted that request. Meanwhile, the trial court allowed the State to examine the venire extensively about the punishment for first-degree murder, even addressing the issue individually with 29 panelists. Eight of those 29 panelists ultimately served on the jury.

A challenge to *voir dire* generally focuses on the questions that the trial court precluded defense counsel from asking. *State v. Clark*, 981 S.W.2d 143, 146 (Mo. banc 1998). "The absence of a specific question in the record does not prevent appellate review." *Id.* The failure to articulate a precise question is not fatal as long as counsel informed the trial court of the area he wanted to explore. *Id.* Here, defense counsel informed the trial court during argument on the motion *in limine* that he expected the law and the facts of the case to support an instruction on the lesser-included offense of second-degree murder, and that he wanted to ask the venire panel

6

whether they could consider the full range of punishment should the defendant be found guilty of second-degree murder. Thus, the point is preserved for our review.

A defendant is entitled to a fair and impartial jury. U.S. CONST. amends. VI, XIV; MO. CONST. art. I, sec. 18(a). An adequate *voir dire* to identify unqualified jurors constitutes one aspect of the guarantee of a defendant's right to an impartial jury. *Clark*, 981 S.W.2d at 146. "The purpose of *voir dire* is to discover bias or prejudice in order to select a fair and impartial jury." *Id.* Without an adequate *voir dire*, the trial judge cannot fulfill her responsibility to remove prospective jurors who cannot impartially follow the court's instructions and evaluate the evidence. *Id.* To this end, courts allow a liberal latitude in the examination of venirepersons. *Id.* The one legitimate limitation occurs when questioning tends to create prejudice. *State v. Busse*, 169 S.W.3d 900, 903 (Mo. App. S.D. 2005).

Because of the myriad of possible inquiries, however, the trial court has discretion to judge the appropriateness of specific questions. *Clark*, 981 S.W.2d at 146. The trial judge supervises *voir dire*, and the nature and extent of the questions that counsel may ask lie within the court's discretion. *Id.* The trial court must consider the particular question within the context of the case when ruling on the question's propriety. *Id.* We review the trial court's rulings for an abuse of discretion. *Id.* In addition, the defendant bears the burden of showing a real probability exists that he suffered prejudice by the trial court's abuse of discretion. *State v. Williams*, 247 S.W.3d 144, 154 (Mo. App. S.D. 2008).

In this case, the trial court allowed the State to exhaustively examine the venire about whether the panelists could assess a sentence of life imprisonment without the possibility of parole should the jury find the defendant guilty of first-degree murder. Beyond the general questions to the venire as a whole about members' ability to follow the law on sentencing, the

7

trial court allowed the State to individually address 29 venire members about whether they could assess a sentence of life imprisonment without the possibility of parole. Four venirepersons were struck because they stated that they could not recommend a sentence of life without the possibility of parole, and one venireperson was struck because he hesitated before confirming that he could recommend such a sentence. Eight of the twelve panelists who ultimately served on the jury were among the 29 venirepersons individually examined on the subject who stated that they could assess such a sentence. Yet while allowing the State to ask more than 30 times about the venire's ability to sentence the defendant for first-degree murder, the trial court precluded the defendant from asking even once about the panelists' ability to consider the entire range of punishment should the jury find the defendant guilty of second-degree murder.

In *State v. Morris*, the trial court precluded the defendant from asking the venire members whether they could follow specific instructions about multiple lesser forms of homicide. 784 S.W.2d 815, 817 (Mo. App. E.D. 1990). The trial court had, however, offered the defendant an opportunity to inquire whether the venire could consider the full range of punishment from the minimum to the maximum sentence. *Id.* at 818. Unlike our case, the trial court's ruling in *Morris* did not foreclose a general question such as whether a venire member was unable to consider the minimum punishment. Rather, the trial court in *Morris* would have allowed the *voir dire* questions that were precluded here. This Court in *Morris* rejected the contention that when the State is authorized to inquire about the death penalty, the defendant must be allowed to ask the venire specifically whether panelists could consider the least possible sentence for each conceivable lesser-included homicide. *Id.* at 819. But the Court added the caveat, "providing the jury is selected after determining whether each member of the venire could follow the instructions of the court and consider the range of punishment *on all crimes subsequently*

8

*submitted.*" *Id.* (emphasis added). "[I]t is entirely proper for the jury to be informed in voir dire of the proper range of punishment for an offense." *State v. Drisdel*, 417 S.W.3d 773, 783 (Mo. App. E.D. 2013). Thus, we conclude that as long as the defendant's question is in proper form, the trial court should allow the defendant to determine whether the venire members can consider the entire range of punishment for a lesser-included form of homicide.

The State cites *State v. Busse*, 169 S.W.3d 900 (Mo. App. S.D. 2005), and *State v. Williams*, 247 S.W.3d 144 (Mo. App. S.D. 2008). In *Busse*, the Southern District held that the trial court did not abuse its discretion when it ruled that the defendant could talk to the venire about a long term of imprisonment generally, but that she could not talk about a specific range of years. 169 S.W.3d at 904-05. Likewise in *Williams*, the trial court precluded the defendant from making any statements concerning the specific ranges of punishment for the charged offenses. 247 S.W.3d at 152. The trial court, however, instructed the defendant that he could inquire about punishment during *voir dire* if he used the general language set forth in *State v. Busse. Id.*

Both *Busse* and *Williams* are distinguishable from this case. In those cases, the trial court allowed the defendant to talk about a serious punishment generally albeit not about ranges of punishment for specific crimes. Here, the trial court prohibited the defendant from asking *any* question about punishment for second-degree murder. Furthermore, unlike this case, neither *Busse* nor *Williams* indicated that the trial court allowed the State to conduct exhaustive *voir dire* on the issue of punishment for first-degree murder while precluding the defendant from asking anything related to punishment for the lesser-included offense of second-degree murder, an instruction that the parties anticipated and that the court, in fact, gave.

The defendant's right to an impartial jury is meaningless without the opportunity to prove bias. *Clark*, 981 S.W.2d at 147. Where the burden to prove bias rests on the party seeking

9

exclusion, the party must be allowed the leeway to do so. *Id.* The trial court properly allowed the State to determine whether venire members could follow the court's instructions and impose the mandatory sentence for first-degree murder. However, the trial court's apparent reason for precluding the defendant from asking anything about punishment for second-degree murder—because the State charged only murder in the first degree—was unreasonable. After all, the trial court allowed the State to extensively examine the venire about its ability to assess a sentence of life imprisonment without the possibility of parole for first-degree murder. But the trial court denied the defendant any opportunity to determine whether the venire members could follow the law and the court's instructions and consider the entire range of punishment for the lesser-included offense of second-degree murder. An instruction on the lesser-included offense of second-degree murder was obviously warranted, the court actually gave such an instruction, and the parties recognized in advance that this would occur. Given these circumstances where the State had free rein and the defendant was wholly denied any similar opportunity, we conclude that the trial court abused its discretion.

To be entitled to relief, the defendant must establish that he suffered "a real probability of injury." *Id.* at 147. We conclude that the defendant has met his burden. Because the trial court precluded the defendant from asking *any* question related to the penalty for second-degree murder, the defendant was not allowed to determine which venirepersons could consider the entire range of punishment or could follow the court's instructions regarding that offense. In contrast, through its extensive questioning, the State had the opportunity to discover the venirepersons' attitudes and to exercise its challenges—both peremptory and for cause—in a manner that the trial court denied the defendant.

10

The record reveals that the jury struggled with the penalty for second-degree murder. After about three hours of guilt-phase deliberations, the jury sent a note to the trial court asking to be informed of the penalty for second-degree murder should the jury convict the defendant of that offense. While the jury had heard about the mandatory punishment for first-degree murder more than 30 times, in contrast, the jury had received no information about the punishment for second-degree murder, not even whether second-degree murder carried a mandatory sentence or a range of punishment. The trial court responded that "[i]n your deliberations, you will be guided by the instructions of law as given." The defendant objected because he had not been allowed *voir dire* on the range of punishment—from ten to 30 years or life imprisonment—and the venire's ability to follow the law if instructed on second-degree murder. The trial court overruled the defendant's objection.

During penalty-phase argument, the defendant urged the jury to sentence the defendant to a term of 15 years of imprisonment. The State argued for a sentence of life imprisonment. The jury again struggled with the issue of punishment as demonstrated by its deadlock after two hours of deliberation. After receiving the hammer instruction regarding punishment, the jury assessed a term of 30 years of imprisonment for second-degree murder.

The State argues that the defendant has failed to show a real probability of prejudice arising from the trial court's ruling because the defendant was ultimately sentenced within the range of punishment. We disagree. According to the State's logic, a defendant could never show a real probability of prejudice unless he could show that he received a sentence beyond that authorized by law. Of course, that outcome would always constitute plain error resulting in manifest injustice or miscarriage of justice, demanding correction on that basis. The State further argues that the defendant cannot show a real probability of prejudice because the judge

11

ultimately imposes the sentence, and that she could impose a sentence less severe than that recommended by the jury. While it is true that the trial judge might impose a lesser sentence, we do not conclude that trial judges are unaffected by the jury's recommendation.[3] And that the judge might impose a lesser sentence than the jury recommends should not be confused with the jury's ability to consider the entire range of punishment in the first place, that ability being the reason the defendant sought to conduct *voir dire* on the issue.

Having determined that the trial court abused its discretion and that the defendant has shown a real probability of prejudice, we now consider the defendant's remedy. "It is fundamental that the appellate remedy should extend no further than the scope of the wrong." *State v. Roe*, 6 S.W.3d 411, 417 (Mo. App. E.D. 1999). The wrong here is that the trial court precluded the defendant from asking the members of the venire whether they could consider the entire range of punishment for second-degree murder in the event the jury found the defendant guilty of that offense, while allowing the State to extensively question the venire members about their ability to assess punishment of life imprisonment without parole in the event the defendant were found guilty of first-degree murder. Under these circumstances, the appropriate disposition of the defendant's claim of error is to remand the case for a new trial of the penalty phase for the offense of murder in the second degree.

We affirm the defendant's conviction by the jury of the offense of second-degree murder and the conviction and sentence of 15 years for armed criminal action. But we vacate the defendant's sentence of 30 years for murder in the second degree, and in conformity with the dictates of Rule 30.22, we remand the case with directions that the trial court conduct a new penalty-phase of the trial and resentence the defendant for second-degree murder.

---

[3] The judge cannot impose a sentence greater than that assessed by the jury unless the term the jury declares is less than the authorized lowest term for the offense. Section 557.036 RSMo. (Supp. 2013).

*Exclusion of the Victim's Statements to the Defendant*

In his second point, the defendant claims the trial court plainly erred in sustaining the State's hearsay objection, thus precluding him from testifying about what the victim said immediately before the defendant shot the victim, purportedly in self-defense. The defendant advances two arguments. First, he asserts that his testimony did not constitute hearsay because it was not offered to prove the truth of the matter asserted—the truth of the victim's statements. Second, even assuming *arguendo* that the testimony constituted hearsay, the defendant contends the state-of-mind exception to the hearsay rule applied.

The defendant did not make an offer of proof nor did he include this issue in his motion for new trial. Thus, the issue is not preserved for our review, and we can review the claim only for plain error. We have the authority and the discretion to review plain errors affecting substantial rights when we determine that a manifest injustice or miscarriage of justice has occurred. Rule 30.20. Plain error is evident, obvious, and clear, and we determine whether such errors exist based on the facts and circumstances of each case. *State v.McCleary*, 423 S.W.3d 888, 896 (Mo. App. E.D. 2014). The alleged error must have had a decisive effect on the jury's determination. *Id.* We will find a decisive effect when a reasonable probability exists that the verdict would have been different but for the alleged error. *Id.*

We apply the plain-error rule sparingly, and the rule does not justify review of every point that was not properly preserved. *Id.* Plain-error review consists of a two-step analysis. *Id.* First, we determine whether the asserted claim of plain error facially establishes substantial grounds to believe that a manifest injustice or miscarriage of justice has occurred. *Id.* If we find that facially substantial grounds exist, we then move to the second step of the analysis, and

13

engage in plain-error review to determine whether manifest injustice or a miscarriage of justice actually occurred. *Id.*

A hearsay statement is an out-of-court statement offered to prove the truth of the matter asserted. *Drisdel,* 417 S.W.3d at 787. Generally, hearsay statements are inadmissible. *Id.* The hearsay rule does not render inadmissible what the victim said unless his statements are offered for the truth of what he said. *State v. Hendrix,* 699 S.W.2d 779, 781 (Mo. App. S.D. 1985). An out-of-court statement that is not offered for its truth is not hearsay, and therefore, is admissible even if it does not fall within a recognized exception to the hearsay rule. *State v. Marshall,* 410 S.W.3d 663, 673-74 (Mo. App. S.D. 2013). "Testimony of what another said offered in explanation of conduct rather than as proof of the facts in the other's statement is not inadmissible hearsay." *Id.* at 674 (quoting *State v. Murray,* 744 S.W.2d 762, 773 (Mo. banc 1988)).

The statements were relevant to the defendant's claim of self-defense. *Hendrix,* 699 S.W.2d at 781.

> The same rationale applies to proof by the defendant, in cases of assault or homicide, of communicated threats made to him by the person whom he is alleged to have killed or assaulted. If offered to show his reasonable apprehension of danger it is not offered for a hearsay purpose; its value for this purpose does not depend on the truth of the statement.

*Id* at 782 (quoting McCormick, Evidence sec. 249 (3d ed. 1984)).

Here, the defendant claimed that he acted in self-defense, and sought to testify to the statements the victim made to him shortly before the shooting. The State objected on the basis of hearsay, and the trial court twice sustained the objection, instructing the defendant that he could not relay what the defendant said. The defendant then did not make an offer of proof, so we do not know precisely the content of the verbal exchange the defendant claimed occurred between himself and the victim immediately before the shooting.

14

The trial court erred in sustaining the State's hearsay objection to this testimony. The victim's purported statements were not offered for their truth, but rather to explain the defendant's conduct after hearing these statements. Consequently, these statements did not constitute hearsay, and were not inadmissible as such. We hold that the defendant's claim facially establishes substantial grounds to believe that a manifest injustice or miscarriage of justice has occurred.

We now move to the second step of the plain-error analysis to determine whether a manifest injustice or miscarriage of justice actually occurred. We conclude that it did not. The trial court erroneously precluded the defendant from conveying the statements the victim purportedly made immediately before the shooting. Nonetheless, the trial court allowed the defendant to testify that he and the victim argued over money; that the victim was hostile, appeared threatening, and attempted to dominate the defendant; that they continued to argue some ten minutes after arriving at their destination; that the victim continued yelling at the defendant outside the car; and that the victim continued yelling as he retrieved his jacket from the car and placed his gun in his jacket pocket. The defendant explained, "It was like he was dominating me, talking aggressively to me, hostile to me and then he pointed a weapon at me." The defendant testified that the victim began walking away from the car, then drew his gun, raised, and aimed it at the defendant. The defendant stated he "thought that was an imminent threat on [his] life."

As a result of the defendant's testimony, the jury could understand that the defendant claimed he felt an imminent threat to his life from the victim. The trial court allowed the defendant to explain that he and the defendant were arguing, and that the defendant appeared dominating, aggressive, and hostile immediately before pointing a gun at the defendant. Thus,

15

we do not find that a manifest injustice or a miscarriage of justice actually occurred, despite the trial court's erroneous ruling. We deny the defendant's second point.

We conclude that the trial court abused its discretion in its restriction of *voir dire*. Therefore, we remand the cause for a new penalty phase of the trial and for resentencing for the conviction of second-degree murder after the jury's new assessment of punishment. We affirm the defendant's conviction and sentence for armed criminal action.

_____
LAWRENCE E. MOONEY, PRESIDING JUDGE

CLIFFORD H. AHRENS, J., and
GLENN A. NORTON, J., concur.